# DENTON BROS. vs. GILL & FISHER.

*Sales—Failure of Consideration—Right of Buyer who has Resold the Goods to Recover for a Deficiency Without Having Reimbursed his Sub-Vendee—Usage.*

When all of the goods designated in the contract and paid for are not delivered, there is a failure of consideration to the extent of the deficiency which affords the buyer a right of action at once for the breach of contract by the seller.

When the seller delivers less than the quantity of goods named in the contract and paid for, and the buyer re-sells the goods to a third party as containing the amount called for by the contract and receives payment thereof, the buyer is entitled to maintain an action against the seller for the deficiency in quantity, although he has not actually made good the shortage to his sub-vendee but is merely liable therefor.

Plaintiff bought from defendant three thousand quarters of corn for shipment to Liverpool, receiving a bill of lading for that quantity. He resold the corn to A, who sold it again to B, both sales being made upon the faith of the bill of lading. When the corn arrived at Liverpool it was found to be about 216,000 lbs. short in weight. B was refunded the amount of the shortage by A, who made demand upon plaintiff for the same amount. Plaintiff then brought this action to recover the amount of the deficiency. *Held*, that the action may be maintained although the plaintiff has not actually paid to his vendee the amount claimed on account of the shortage.

A contract for the sale of grain for shipment to a foreign port provided that any deficiency on bill of lading weights should be paid for by the seller, and any excess over bill of lading weight should be paid for by the buyer at contract price. In an action against the seller to recover for a deficiency in weight the plaintiff's right to recover is not defeated or affected by evidence that there existed among grain merchants a general usage to the effect that in sales of corn for shipment to a foreign port, the shipping weights taken at the port of shipment upon loading the vessel, as stated in the bill of lading, should be final, and that in case of shortage in the out-turn at the port of discharge the purchaser should have no claim upon the seller on account of the shortage. Such usage cannot be allowed to affect this contract because it is in conflict with the clear provision that "any deficiency of bill of lading weights to be paid for by seller."

Defendant having agreed to sell to plaintiff three thousand quarters of corn for shipment to a foreign port, received a bill of lading therefor, which was issued by the ship owner upon the faith of a certificate from

the foreman of a railway company's elevator that that quantity had been loaded aboard the ship. Defendant surrendered the elevator receipts calling for that quantity. In an action to recover for a shortage in quantity delivered, *held,* that the surrender by the defendant to the railway company of the elevator receipts calling for the whole amount is no defense.

*Held,* further, that the plaintiff has no cause of action against the railway company on account of the shortage, as there was no contract between him and that company.

Appeal from the Superior Court of Baltimore City (WRIGHT, J.)

*Plaintiffs' 2nd Prayer.*—If the jury shall believe from the evidence that the whole amount of grain called for by the contract between the parties in this action, which has been offered in evidence was not in fact shipped on the "Indore" on the voyage mentioned in the evidence, then the plaintiff is entitled to recover under the pleadings in this case the market value in Liverpool on the day when the rest of the corn was delivered of so much of said whole amount as they shall find was not actually so shipped, with interest thereon from that date to the day of their verdict, in the discretion of the jury. (*Rejected.*)

*Plaintiffs' 3rd Prayer.*—If the jury shall believe from the evidence that the whole amount of the grain called for by the contract between the parties to this action, which has been offered in evidence was not in fact delivered by the Baltimore and Ohio Railroad Company at its elevators to the "Indore," then the surrender by the defendants to the said railroad company of elevator receipts calling for the whole amount of such grain (if the jury shall find such surrender) is, under the pleadings in this case, no defense to this action. (*Rejected.*)

*Plaintiffs' 4th Prayer.*—If the jury shall find that the defendants surrendered to the Baltimore and Ohio Railroad Company elevator receipts for three thousand quarters of corn and directed it to deliver the corn called for by the same to the "Indore" in performance of the contract mentioned in this case, but that said railroad company did not deliver the whole

thereof to the said steamer then the defendants were and still are entitled to recover from the said ·railroad company the market value of the shortage in such delivery or, in the event of a recovery in this action by the plaintiffs against the defendants, the defendants would be entitled to recover from said railroad company the amount of damages, interest if any, costs and expenses incurred by the defendants in this action. (*Rejected.*)

*Defendants' 4th Prayer.*—That it is conceded as a fact in this case that prior to the institution of this action, the plaintiffs received payment from Bowring & Archibald for the full amount of the 3,000 quarters of corn mentioned in the contract between the plaintiffs and defendants offered in evidence, and that there is no evidence in this case that prior to the institution of this action the plaintiffs refunded said payment or any part thereof to Bowring & Archibald, and the jury will, therefore find their verdict for the defendants. (*Granted.*)

The cause was argued before McSherry, C. J., Page, Boyd, Pearce, Schmucker, Jones and Burke, JJ.

*John J. Donaldson* (with whom was *Daniel H. Hayne* on the brief), for the appellant.

The facts as set out in the fourth count are different from the facts as developed at the trial, but as the ruling by Phelps, J., sustaining the demurrer, was considered by Wright, J., as a precedent in dealing with the prayers, it becomes material to consider the demurrer.

The count, in substance, claims a recovery from defendants for a partial failure of consideration, on the ground that plaintiffs are liable over for the same failure of consideration to their immediate buyers, such sub-vendees in turn being liable over to their vendees, the sale in every case being made by the bill of lading as representing an actual shipment of grain to that amount named in it.

That a vendee may recover from his vendor as part of his damages such sum as the vendee may be liable for to his sub-vendee, even though he has not yet paid, it is submitted is no

longer an open · question. *Benjamin on Sales* (2 ed.) 754: ·*Randall* v. *Roper*, El. , Bl. and El. 84; *Dingle* v. *Hare*, 7 C· B. N. S. 145; *Hammond* v. *Bussey*, L. R. 20, Q. B. D. 79; *Grebert-Borguis Co.* v. *Nugent*, L. R. 15, Q. B. D. 85; *Josling* v. *Irving*, 6 H. & N. 512; *Hydr. Eng. Co.* v. *McHaffie*, L. R. 4, Q. B. D. 670; *Elbinger Actein Gesellschaft* v. *Armstrong*, L. R. 9 Q. B. 473.   Nor have we been able to find any case to the contrary; none was cited by opposing counsel or relied on by the Court.

· It will be borne in mind that the case, *as tried,* presented a very different aspect from the cause of action alleged in the fourth count.   The action went to trial on the common counts, and was an ordinary *assumpsit* for failure of consideration, an action for money had and received.   By the facts as appearing in the record every purchaser had been reimbursed for the shortage by his immediate seller, except the first, sub-vendees, ·viz: Bowring & Archibald.

It is elementary in the law of sales that where the price has been paid, and all the goods not delivered in accordance with the terms of sale, a right of action for the failure of consideration at once vests in the vendee.   *Keener on Quasi Contracts*, 120, 121, 124; *De Vaux* v. *Connolly*, 8 C. B. 640.

The very moment then that the "Indore" reached her destination, having received less than the whole 3,000 quarters bought and paid for by the (legal) plaintiffs, Denton Bros., there vested in them a right of action for the value of the deficiency.   When or how was this right of action lost?

The appellees (defendants below) say it is gone, because the (legal) plaintiffs, under a like mistake, sold the grain on the "Indore" as and for 3,000 quarters to a third party, and *although absolutely liable at law* to reimburse such third party, have not *in fact* done so; therefore, the right of action is gone. It will be noted that this argument admits that, had the (legal) plaintiffs actually paid their liability to their immediate vendees (a liability incontestable), they could recover against their immediate vendors.   We should ·accordingly have a right of action in contract against a vendor vested in a

vendee until his sub-vendee is made the victim of a like mistake, when the right of action ceases, and then when the vendee has (as he is legally bound to do) made good the mistake to the sub-vendee, coming to life again in the vendee.

What bearing upon the rights of parties under a contract dealings between one of them and a third party *in no privity* with the other, can have on the rights of the parties under the contract, it is difficult to see.

All the industry and research of counsel for appellees was unable to produce any authority for the prayer in question, nor have we been able to find any. Nor have we been able to find any case in which such a defense was set up to an action for failure of consideration. There are cases, however, that show that dealings of the vendee with third parties are entirely irrelevant to an action by him against his vendor for failure of consideration. These cases deal with the measure of damages in such an action, the established rule that the recovery is for the market value at the time and place of delivery of the lacking goods. *Smrethurst* v. *Woolston*, 5 W. & S. 106, and hold that if the buyer has a contract for a re-sale at a higher price. his damages will not be increased thereby. *Williams* v. *Reynolds*, 6 B. & S. 495.

The defendants offered evidence (which was admitted subject to exception) of an alleged custom in the American grain trade by which the weights of grain bought and sold for export as entered in the bills of lading were conclusive on the buyer, whether the grain or all of it called for the bills of lading *was actually shipped or not.* At the end of the testimony, plaintiffs offered a prayer, to exclude this evidence from the consideration of the jury. This prayer the Court rejected and granted defendants' fifth prayer that, if they found such a custom, it precluded a recovery.

The contract between plaintiffs and defendants was in *writing* and was for a sale of *three thousand* quarters of corn "5 per cent more or less as per 'London Contract.'" The "London Contract" referred to contains the provision "2 per cent 'more or less'" and the further provision, "Seller has the op-

tion of shipping a further 3 per cent more or less on contract quantity, excess or deficiency over the 2 per cent to be settled at the c. f. & i. price on date of bill of lading; value to be fixed by arbitration, unless mutually agreed." A later provision in the same contract reads: "Any deficiency on bill of lading weight to be paid for by seller, and any excess over bill of lading weight to be paid for by buyer at contract price."

The alleged custom is therefore in direct contradiction of the express terms of a written contract. "The contract being definite and certain as to quantity, evidence of a custom to excuse a failure to deliver the agreed quantity cannot be received." *O'Donoghue* v. *Leggett*, 8 N. Y. Sup. 426; *De Vaux* v. *Connolly*, 8 C. B. 640; *Conner* v. *Robinson*, 2 Hill, Law, 354. This is but one application of the established principle that usage can never be invoked to contradict, alter or vary the express terms of a contract. *Foley* v. *Mason*, 6 Md. 37, 49; *Barker* v. *Borzone*, 48 Md. 491; *Ins. Co.*, v. *Butler*, 55 Md. 240; *Gibney* v. *Curtis*, 61 Md. 192, 201; *Fertilizer Co.* v. *White*, 66 Md. 456; *Base Ball Co.* v. *Pickett*, 78 Md. 426.

Nor can evidence of usage be admitted to oppose or alter a general principle or rule of law (as here the right to recover for failure of consideration), and upon a fixed state of facts to make the legal rights and liabilities of the parties other than they are by the common law. *Foley* v. *Mason*, 6 Md. 37, 49; *Rasin* v. *Clark*, 41 Md. 161; *Fertilizer Co.* v. *White*, 66 Md. 456; *Bank* v. *Talliaferro*, 72 Md. 170.

The usage to be admissible must be reasonable and just. *Fertilizer Co.* v. *White*, 66 Md. 456; *Second Nat. Bank* v. *West. Nat. Bank*, 51 Md. 128. It is submitted that the alleged usage will not bear this test.

*D. K. Este Fisher*, for the appellees.

The appellants were paid by Bowring & Archibald the full price for which the appellants sold to them this corn, and they have not refunded it to Bowring & Archibald or their assignees, C. T. Bowring & Company.

The appellants have consequently sustained no damage.

They have not parted with a single dollar in consequence of the shortage. Actions at law are for the purpose of procuring a reimbursement for damage sustained, and where none has been sustained, no action can be maintained.

*Johnson* v. *Oehmig*, 95 Ala. 189, illustrates the indisposition of Courts to anticipate a loss. The plaintiff sold goods to the defendant. The defendant resisted payment of the purchase price on the ground that the plaintiff had no title to the goods, but he remained in possession. The Court held that this was no defense, because though the plaintiff had no title, the defendant might never be dispossessed by the real owner. The remarks of the Court were very apposite to the present point.

*Willson* v. *McEvoy*, 25 Cal. 170, etc., is another illustration. The question was whether the plaintiff in an action upon an injunction bond could recover as damages the amount of his liability to his counsel for their services in the case, and the Court held not, *because he had not paid them.* It distinguished the cases which allow plaintiff in damage suits to recover for doctor's bills, &c., incurred though not paid, saying that this is explained by their being actions of tort, and that the law casts the burden of these liabilities upon the defendant as a consequence of his tortious acts.

*Lott* v. *Mitchell*, 32 Cal. 24, was similar, the action being upon an indemnity bond given a Sheriff. Against him *a judgment had been recovered, and the question was, could an action be maintained on the bond without the payment of the judgment,* and it was held not. *Roussin* v. *Stewart*, 33 Cal. 210, etc., is similar to the last case.

In *Hare* v. *Van Dusen*, 32 Barbour, 92, &c., the facts were that the plaintiff sold land to the defendants, who paid therefor with other lands, and a covenant against incumbrances beyond $4,000 thereon. It turned out that the latter lands were encumbered beyond $4,000, and a *judgment by the lienor was obtained against the defendants and the plaintiff for a sale of the lands to satisfy the lien.* Thereupon, and before said judgment was enforced, the plaintiff began an action against

the defendants to enforce a claim against the lands sold to them by him, on the ground that the purchase price had been only partly paid, because the value of the land received in exchange failed to the extent of said lien. It held that the action was premature, because there had been no *eviction*—no sale at the time of the commencement of the suit.

In *California Dry Dock Co.* v. *Armstrong*, 17 Fed. Rep. 221, the action was brought by a lessee for damage done to the demised premises by a stranger, estimated to amount to about $12,000. *The lessee had not repaired the damages, but was bound to do so under its lease, and had not incurred and paid expense on account of the damage.*

On the distinct ground that the lessee had not made the repairs it was held that no action could be maintained. There were no damages to the plaintiff; there was only an unpaid liability which might never be paid.

In *Close* v. *Crossland*, 47 Minn. 500, the defendant and plaintiff made an exchange, the defendant giving to the plaintiff a pair of ponies for a horse. It turned out, unknown to the parties, that the ponies were subject to a chattel mortgage, and the mortgagee took them in proceedings under a statute for claim and delivery in an action to recover them. This taking and delivery under the statute is provisional to await the result of the suit. The plaintiff answered, resisting the claim, and pending that suit brought this action against the defendant for the recovery of the horse on the ground of failure of the consideration. It was held that the plaintiff could not maintain a suit for the return of the horse, because as yet he had not been evicted of the ponies. He was just as liable to surrender the ponies to the mortgagee, as the appellants in this case were liable to refund the price of the shortage to Bowring & Archibald if the whole quantity of corn was not loaded ; but he might never be compelled to do so, just as Bowring & Archibald might not be obliged to pay.

The apppellants' counsel in this case cited in the Court below several English cases which seemed to sustain his right to sue before actually paying his liability ; the reason being that

the defendant could not resist the liability, and consequently that an action was maintainable. But these cases go further than the American cases ; and it will be found that the liability was either admitted or so clearly established that the claims could not be resisted.

In the present case, however, the claim was certainly neither established against Denton Brothers, the appellants, nor admitted by them. It is true that the declaration alleges their liability to pay ; but this was not *their* admission. Their supposed claim against the appellees, Gill & Fisher, had been assigned by the appellants to C. T. Bowring & Co., Ltd., before the action was brought, and in the assignment they expressly refuse to concede the facts necessary to a liability.

But even supposing that there was a *clear* liability, though C. T. Bowring & Co., Ltd., should demand its payment, they might never sue for it. Taking all things into consideration, they might abandon it, or make a compromise of it, or there might be some counter claim to it ; and ought not the original vendor to get the benefit of such a situation ? The same reasoning which requires that an eviction should be shown in order to enable one who has purchased chattels from a vendor to bring an action against him for failure of consideration, would seem to apply to the case of a claim for an alleged shortage in delivery upon a sale of corn. The appellants have parted with nothing. They have the whole purchase price paid them by their sub-vendee in their pockets. So long as they are able to hold on to that, they have suffered no damage.

Every custom, as has been pointed out by a learned Judge (*Humphrey* v. *Dale*, 7 El. & B. 266, 90 Eng. Com. Law Rep. 273), is a contradiction in a measure of the *expressed* terms of the contract ; but notwithstanding that, the admissibility of proof of custom has been over and over again admitted. Thus in *Smith* v. *Wilson*, 3 Barn. and Adolph, 728, it was held that it might be shown that in a lease of a rabbit warren in a particular county, the words "1,000 rabbits" meant, according to the custom of the county, *1,200 rabbits*. Could anything be

more contradictory of the letter of the contract be found than that ? The contract was for 1,000 rabbits, and proof was admitted to show that 1,000 meant 1,200.

A similar custom in the herring trade was admitted in another case to show that six score herrings went to the hundred and sixty score to the thousand. *Addison on Contracts*, p. 205.· So, too, in *Bank of Columbia* v. *Fitzhugh*, 1 H. & G. 248, this Court held properly admissible proof that in the payment of a promissory note there were by the custom of Washington four days of grace, though this custom was contrary to the general mercantile law which allows but three.

And again, in *Williams* v. *Woods*, 16 Md. 257, in a sale of coffee with nothing said in the contract as to the time of payment, and which therefore would, under ordinary circumstances, be a sale for *cash*, proof was admitted to show that according to the custom of the coffee trade, the vendee was entitled to a credit of six months.                    ·

Another illustration is *Lowe* v. *Lehman*, 15 Ohio St. 180, 184. Here was a building contract and the plaintiff agreed— "to furnish and lay up good merchantable brick in the wall * * * for six dollars and twenty-five cents per *thousand*." At the trial he offered evidence of a custom that counting the thousands is done by measurement "deducting for all openings in the wall except openings of chimneys and jams (which are to be measured solid) but making no deduction for caps, sills or lintels." It was contended that the custom contradicted the express terms of the contract. That the words *per thousand* were clear and must be taken in their ordinary meaning. The Court held the proof admissible.

The true test of whether a custom is contradictory of the contract is to read the contract as if the custom were written in it, and see then if it renders the contract insensible or contradictory. *Humphreys* v. *Dale*, 7 El. & Bl. 266; 90 *Eng. Com. L. Rep.*, 273.

Then read the contract in this case with the addition to it of the words "*Bill of Lading weights final*," at some convenient place, as after the words "inspection at port of lading,"

and does the introduction of these words contradict the contract? They merely furnish the rule of evidence in case of disputes over the quantity of the out-turn.

It has been shown that the method of doing business in the export trade requires the vendor to surrender to the railroad company his elevator certificates for the grain to be shipped, and that the whole machinery of shipping is in the exclusive control of the railroad company. In consequence of the custom of doing business therefore, the obligation of the vendor with reference to the shipment is necessarily discharged when he has delivered to the railroad company the elevator certificates with the order to put the grain aboard the steamer, and has received and delivered to the vendee the bills of lading. The elevator certificates having been surrendered to the railroad company to make the delivery, and the railroad company under the practice having done that, upon the faith of which the ship owner is induced to issue the bills of lading—namely, having made a delivery on board the ship, and having issued a certificate that the full quantity has been put on board, which bills of lading the railroad company knows are to be used in trade and are to be made the subject of sale for their face value, the railroad company thereafter becomes liable to the holder of the bills of lading for the accuracy of their statement of the quantity received on board. And this necessarily results from the method of the trade. The railroad company is as much a party to it as the vendor and vendee. It takes part in it. Nor is there anything harsh in this result. The grain is in its possession. The whole thing being in its exclusive management and control, it ought to be responsible to the vendee and his assigns for the accuracy of the shipment, particularly as its certificate that it has put the whole quantity aboard is the basis on which the bills of lading are issued, which are to be set afloat in the grain market and are the instruments by which the price is obtained from the vendee. It issues the certificate knowing that it is to be the inducement to the issue of the bills of lading; and, making a representation upon which merchants are to act to their detriment, it is

responsible for the consequences.    If it ships the full quantity
it has done its duty and is discharged.    If it has not (and this
can be shown as well by the vendee as by the vendor) it
suffers no loss by being obliged to make the deficiency good,
for it does so, not out of its own grain, but out of that of the
vendor in its possession represented by the elevator receipts
which he·has surrendered to it.

Where one makes a representation to be acted upon by
others, and the representation is not ·in accordance with the
facts, though there be no fraud, the person or corporation
which makes the representation is responsible in *tort* if it was
made in the performance of a duty.    *Burroughs* v. *Lock*, 10
Vesey, Jr., 470; *Brownlie* v. *Campbell*, L. R. App. Cas. 935;
*Derry* v. *Peek*, L. R. 14 App. Cas. 360; *Law* v. *Bonnerie*, L.
R. 3 Ch. Div. (1891) 99; *Houston* v. *Thornton*, 122 N. C. 370;
*Kinkler* v. *Jamaica*, 84 Tex. 119.

And the responsibility is not limited to the person to whom
the reprensation is addressed, but will inure to the protec-
tion of any one expected to act upon it.    *Nash* v. *Minnesota
Title, etc., Co.*. 159 Mass. at 442.

In *Burroughs* v. *Lock*, 10 Vesey, Jr., 470, a trustee was ap-
plied to for information concerning the state of the trust prop-
erty and the interest of the *cestui que trust* therein, by one
contemplating dealing with the *cestui que trust* in respect to it.
The trustee stated its condition, but *innocently* forgot a mort-
gage on it, and made no reference to it; and he was held liable to
the enquirer for his loss, on the principle that where there is a
duty to speak, there a misrepresentation *innocently* made will
bind the person making it for the consequences.

Upon the same principle in *Houston* v. *Thornton*, 122 N. C.
370, where a false statement was issued by a bank, it was held
that the directors were responsible to the plaintiff for his loss
in consequence of acting upon it, though it was not addressed
to him, *and the directors were ignorant of its issue*, because it
was their duty to know whether the statement was true or
false, and not to allow a false statement to be issued, the Court
saying:    "So salutary and just a rule is supported by ample

authority elsewhere, and if it were not, it is correct in itself
and a just protection to which the public is entitled."

In *Nash* v. *Minnesota Title, etc., Co., supra,* the representa-
tion was not made to the plaintiff, but was made to a third
person to enable him to sell some bonds, and the Court held
that it was not necessary that it should have been made to the
plaintiff, if it was made to some one else with the intention
that it should be acted upon.

These principles apply to the present case with much force.
Let us assume for argument's sake that the whole quantity of
corn was not loaded. The railroad company had complete
control and possession of the corn belonging to the appellees.
When they ordered it to be loaded on the Indore, and the
railroad company had acted under the order, it was manifestly
the railroad company's duty to give the appellees some assur-
ance that it had been loaded, and it did so in the shape of a
certificate, which the appellees used, according to custom, in
obtaining the bills of lading. Necessarily the custom of
issuing the bills of lading on the faith of the certificate that
the grain had been loaded, was as well known at the elevator
by the railroad company's officials as it was to merchants.
The grain was known to it to be loaded for export—it was
loaded in a British ship. It knew that the certificate that the
whole quantity had been loaded was to be used by the appel-
lees—otherwise why did it issue it? Necessarily it knew that
it was to be the basis for obtaining the value of the corn from
some one else.

It was the *duty* of the railroad company to load the corn,
and to know what quantity it loaded, and to make no repre-
sentation concerning the quantity loaded except a true one,
and it necessarily knew that the representation made by
it was to be the basis for a payment for the corn. The case
then comes clearly within the principles laid down in the cases
just cited, and there is no sound ground for the argument ad-
vanced by the appellants in the Court below that *they* could
not hold the railroad company, and, therefore, ought to be
allowed to recover against the appellees.

McSHERRY, C. J., delivered the opinion of the Court.

The appellants brought suit in the Superior Court of Baltimore City against the appellees. The declaration contains three of the usual common counts and a fourth count in special *assumpsit*. To the common counts the appellees pleaded and issues were joined thereon; to the special count they demurred and the lower Court sustained the demurrer. The trial then proceeded before a jury on the issues of fact framed on the general issue pleas, and, under the instructions of the Court, resulted in a verdict for the appellees, who were the defendants. From the judgment on that verdict this appeal was taken. The questions here involved are, first, the one raised by the demurrer to the fourth count, and secondly, those arising on the prayers for instructions to the jury. As the question raised by the demurrer and the one arising on the fourth prayer of the appellees, which was granted, and the second prayer of the appellants—which was rejected—are identical, they will be considered together. By doing so but one other inquiry of any consequence will remain to be disposed of, and that is the one presented by the fifth prayer of the appellees which was also granted, and the first prayer of the appellants, which was rejected. To simplify the discussion and with a view to avoid repetition the facts appearing in the record will now be concisely stated.

The appellants, Denton Brothers, are grain merchants in Leavenworth, Kansas. On September the twenty-sixth, 1899, they sold to the firm of Bowring & Archibald, of New York, five thousand quarters of No. 2 corn at forty-three cents per fifty-six pounds "cost, freight and insurance to Liverpool," to be shipped in January or February, 1900. Bowring & Archibald then cabled to C. T. Bowring & Company, Limited, of Liverpool, an offer of five thousand quarters of corn of the same quality on cost, freight and insurance terms, and the last-named company placed the offer with Montgomery, Jones & Company who accepted the terms, and C. T. Bowring & Company cabled Bowring & Archibald of the sale, but C. T. Bowring & Co. did not actually buy the corn. Bowring

& Archibald then drew, with the documents attached, on C.
T. Bowring & Company in the usual way for the price of the
whole 5,000 quarters sold by Denton Brothers to Bowring &
Archibald and sold the draft to bankers.   On January the
20th, 1900, the appellees, Gill & Fisher, through Parker &
McIntyre, brokers, sold to Denton Brothers "three thousand
quarters (5 per cent more or less as per London contract) of
No. 2 corn" at forty-six cents per fifty-six pounds "cost,
freight and insurance to Liverpool;" to be shipped during
February by first-class steamer from any Atlantic port "Pay-
ment by sellers' draft at sight on buyers with documents at-
tached as customary."   In February the steamship "Indore"
received on board in hold 5 at Baltimore and Ohio Elevator C
at Locust Point the corn sold by Gill & Fisher to Denton
Brothers, and upon the faith of a certificate from the railroad
company's elevator foreman that three thousand quarters of
corn of the grade sold had been loaded aboard the "Indore"
for account of Gill & Fisher, the agents of the Johnston Line
of steamships issued to Gill & Fisher three bills of lading for
the three thousand quarters of corn, each bill of lading being for
one thousand quarters.   For three cents per bushel of the
forty-six cents agreed price Gill & Fisher drew on Denton
Brothers who paid the draft on presentation, and for the bal-
ance of the contract price, viz., forty-three cents, at the re-
quest and by the direction of Denton Brothers, Gill & Fisher
drew on Bowring & Archibald, with the bill of lading in-
dorsed in blank, the insurance policies and inspection certifi-
cates attached, and the draft was paid on presentation. These
directions to the appellees were given by Denton Brothers in
part performance of their contract with Bowring & Archibald,
though no proof was offered that the appellees knew of the
existence of that contract.   Montgomery, Jones & Company
paid C. T. Bowring & Company for the whole five thousand
quarters.   When the "Indore" reached Liverpool, about
March the seventh, Montgomery, Jones & Company claim
that the corn delivered to that vessel on account of Gill &
Fisher at Baltimore and Ohio Elevator C weighed out 215,992

pounds short. For the amount of that alleged shortage at
the then value of corn in Liverpool, viz., eighteen shillings
sterling per quarter, Montgomery, Jones & Company made
demand for reimbursement on C. T. Bowring & Company and
were paid by that company the full amount; namely, 349
pounds, 17 shillings and 3 pence. C. T. Bowring & Company
then made claim for the same amount on Bowring & Archi-
bald and were allowed therefor in accounts between them.
In April, 1900, C. T. Bowring & Company took over the
business of Bowring & Archibald as a going concern and as-
sumed all its assets and liabilities. On February the first,
1901, Denton Brothers made to C. T. Bowring & Company
as assignment of any claim they might have against Gill &
Fisher. The record also contains a copy of the "London
Contract" referred to in the memorandum of the sale of the
3,000 quarters of corn for account of Gill & Fisher to Denton
Brothers; and the following clauses appear in that contract:
"Two per cent more or less," and "Seller has the option of
shipping a further 3 per cent, more or less, on contract quan-
tity, the excess or deficiency over the 2 per cent to be settled
at the c. f. & i. price on date of bill of lading; value to be fixed
by arbitration, unless mutually agreed;" and again "Any de-
ficiency on bill of lading weight to be paid for by seller, and
any excess over bill of lading weight to be paid for by buyer
at contract price." It is denied by the appellees that there
was any shortage in the weight of the corn; but with that
contention we have nothing to do as it is conclusively a mat-
ter for the jury to determine.

Compressed into the narrowest compass the situation pre-
sented is this: Denton Brothers purchased from Gill &
Fisher 3,000 quarters of corn, and sold the same corn to
Bowring & Archibald; Bowring & Archibald through C. T.
Bowring & Company sold the same corn to Montgomery,
Jones & Company. The last-named purchasers paid C. T.
Bowring & Company in full. It is alleged that there was a
material shortage in the weight when the corn was delivered.
Montgomery, Jones & Company were refunded the amount

of that shortage by C. T. Bowring & Company; C. T. Bow-
ring & Company were refunded the same amount by Bowring
& Archibald, and the latter have made a demand on Denton
Brothers to refund the same amount.    Denton Brothers have
not paid back that amount but have sued Gill & Fisher, their
vendors, to recover the sum which they, Denton Brothers,
are liable to pay on account of the same shortage to their
vendee.    The question on these facts is can Denton Brothers
maintain this suit until they actually pay back to *their* vendee
the amount claimed by the latter from Denton Brothers on
account of that shortage?    This question is the one raised
by the demurrer to the fourth count of the *narr.* and by the
fourth instruction granted at the instance of the appellees and
the second rejected prayer of the appellants.    We will dispose
of that question before stating or considering the other or re-
maining inquiry.

If Denton Brothers had not resold the grain to Bowring &
Archibald and if, after they had paid Gill & Fisher the agreed
price for the entire three thousand quarters of corn purchased
from the latter, it had been discovered that the vendors had
in fact failed to deliver over two hundred thousand pounds of
the corn sold and paid for, it could not be questioned that
Denton Brothers would have a sustainable cause of action
against Gill & Fisher for a breach of the latter's contract.
How can the resale of the corn by Denton Brothers extin-
guish Gill & Fisher's obligation to comply with their contract,
or exonerate them from the consequences of a breach which
occasions a failure of consideration?    The right of the vendee
to recover from the vendor for a failure of consideration is
founded on the simple fact that the former has not received
from the latter what the vendor sold and agreed to deliver and
what the vendee paid for and contracted to get.    The breach
consists in the failure of the vendor to live up to his contract
and no subsequent sale of the grain by the vendee can oblit-
erate or condone that breach.    If a sale of the same commodity
by the vendee to a sub-vendee extinguishes the responsi-
bility of the vendor to make good a shortage to his vendee,

then a payment to the sub-vendee by his vendor of the damages caused by the shortage, would revive the first vendor's responsibility to his vendee; and thus the obligation of the first vendor to make good a deficiency to his vendee would depend, not upon his own breach of the contract of sale, but upon a collateral and independent transaction between the vendee and a third party who is a total stranger to the original contract of sale. The adjudged cases do not support that view. Allusion will now be made to some of them. Perhaps the most apposite is *Randall and another* v. *Raper*, Ellis, Black & Ellis, 84. The defendant in that case by warranting 30 quarters of seed barley to be then chevalier seed barley, sold the same to the plaintiff at and for 1l. 2s. 6d. per quarter which the plaintiffs paid him. The plaintiffs were corn factors and purchased the seed barley for the purpose of reselling it in the way of their trade. The seed barley delivered was not chevalier seed barley. Without any knowledge of the breach of the warranty and believing the seed to be chevalier seed barley the plaintiffs sold to several sub-vendees the same seed barley delivered to them by the defendant and sold it under a like warranty given by the defendant to the plaintiffs. The sub-vendees sowed the seed and the seed not being chevalier seed barley, as it had been warranted to be, produced inferior crops whereby the sub-vendees were damnified and injured. The plaintiffs then became liable to compensate and make good to the sub-vendees, respectively, the damages by them so sustained and incurred. The plaintiffs—the original vendees—thereupon sued the vendor to recover the amount for which they were liable but had not yet paid to the sub-vendees. Judgment went by default and the damages were assessed under a writ of inquiry before the Deputy Sheriff of Essex. A verdict was directed for 261l. 7s. 6d. reserving leave for the defendant to move to reduce the verdict to 15l. Upon a motion to reduce the verdict, heard by the Court of Queen's Bench it was contended that the verdict should be reduced because the jury were misdirected; and it was argued by Bovill that there ought not to have been any allowance for the

damages in respect to the plaintiffs having agreed to make compensation to their sub-vendees because the amount of the compensation to be paid by the plaintiffs to their vendees had not been ascertained and was not definite. LORD CAMPBELL, C. J., after remarking that if the plaintiffs had paid the sub-vendees the amount of the damages claimed by them there would have been no doubt as to the right of the plaintiffs to recover from the defendant the sums thus paid to the sub-vendees, observed: "But then it is contended, secondly, that even if the damages could be recovered in the event of the actual payment, they cannot be recovered upon a mere liability. I think we cannot lay down a rule that the mere liability cannot be the foundation of damages; if it can, the amount may be estimated by a jury. The demand is made, and is a just one; and, though it is not yet satisfied, yet the jury may find to what extent the plaintiffs are damnified by their having become liable to it." And ERLE, J., said: "But then it is said that here the plaintiffs have made no actual payment; so that, if they recovered such damages in this action, they might put them into their own pockets without paying the sub-vendees. But I think that the true rule is that a liability to loss is sufficient to give the party liable a title to recover." And CROMPTON, J., observed: "Taking the narrowest rule as to the probable and necessary consequences of a breach of contract, these damages fall within it. It is said, however, that the plaintiffs have here only incurred a liability, and have made no payment. But I entirely deny that payment is necessary to entitle a party to recover. Liability alone is sufficient. It has always been customary to state in the allegation of special damages 'whereby the plaintiff became liable to pay;' I recollect a discussion once arising whether an allegation 'whereby the plaintiff paid,' was sufficient without an allegation 'whereby the plaintiff became liable to pay;' but I do not recollect a discussion whether the latter allegation was sufficient without the former. In actions for bodily injuries the liability to pay the surgeon's bill is always allowed as an item of damages. In an action for breach of contract you can recover only once;

and the action accrues at the moment when the breach occurs.
A liability to payment, which has been incurred by a plaintiff
in consequence of the breach of a defendant's contract may
well form a part of the damages, though it may be difficult to
estimate them." In *Josling* v. *Irving*, 6 Hur. & Nor. 512;
*Randall* v. *Raper* was referred to with approval but distin-
guished. *Dingle* v. *Hare*, 7 C. B. N. S. 145, is also directly
in point. In *Muller* v. *Eno*, 14 N. Y. 597, the syllabus
states: "The purchaser may recover for breach of a warranty
although he has sold the goods and no claim has been made
upon him, and he is liable to none on account of the alleged
defect. Nor in such action is he required to prove the price
at which he re-sold the goods. That price may be evidence
of the amount of damages, but does not furnish the rule." In
the judgment of the Court it is said: "The vendor is simply
required to make good his own contract, and I do not
see how he can discharge that obligation by inquiring into
relations between other parties * * * The promise
is not one of indemnity against loss on a re-sale," See also
*Passenger* v. *Thornton*, 34 N. Y. 637, where *Randall* v. *Raper*
is cited with approval. In *Western Twine Co.* v. *Wright*, 11
S. Dak. 521; s. c. 44 L. R. A. 438, suit was brought by the
vendor of binder twine to recover from the vendee the amount
of a promissory note given for the price thereof. Some of the
twine had been sold by the vendee to numerous farmers for
cash and they made no claim on the vendee for reimburse-
ment. It was held that the vendee could defeat a recovery on
the note at the suit of the vendor to the extent of the actual
difference between the real value of the twine and what it would
have been worth had it corresponded with the warranty, even
though " a part of it had been sold for cash, and no claim has
been made by any of the purchasers on account of defects."
The case of *Wheelock* v. *Berkely*, 138 Ill. 153, was cited with
approval.. In the last-mentioned case it was ruled that in an
action for breach of a warranty it is of no consequence what
the purchaser may have received from a re-sale.

The cases cited by the appellees' counsel do not conflict with

those above referred to. They arose either upon indemnity bonds or grew out of the evictions and depended upon entirely different principles. In *California Dry Dock Co.* v. *Armstrong,* 17 Fed. Rep. 221, no question between vendor and vendee was involved at all.

We hold, then, for the reasons and upon the authorities already alluded to that Denton Brothers, the legal plaintiffs, were entitled to recover from Gill & Fisher the amount for which they, Denton Brothers, were liable to the sub-vendee, notwithstanding the fact that Denton Brothers had not paid over the sum for which they were so liable to the sub-vendees. It follows therefore, that there was error committed in sustaining the demurrer to the fourth count of the *narr.*, and that the Court was wrong in granting the appellees' fourth prayer and in rejecting the appellants' second prayer.

*Secondly.* The appellees contended and the Court by granting their fifth prayer and by rejecting the appellants first prayer ruled, that the appellants were not entitled to recover if the jury should find from the evidence that there existed among grain merchants a general and well established usage or custom to the effect that in sales and purchases of corn for shipment to a foreign port, the shipping weights taken at the port of shipment upon loading the vessel, as stated in the bill of lading, should be final; and that in case of shortage in the out-turn at the port of discharge, the purchaser or his assigns should have no claim upon the seller for the value of the shortage. To support that contention and to sustain the rulings upholding it, there must be written into the "London Contract," by force of the usage or custom relied on, some such term as "bill of lading weights final or conclusive." "To be regarded as part of a contract, however, the usage or custom must have both of the following elements: (1) It must be actually or constructively known, and (2) it must be consistent with the contract. If either of these elements is lacking the usage or custom cannot be regarded as part of the contract." 2 *Page on Contracts*, sec. 604. And this Court said in *Foley & Woodside* v. *Mason & Son,* 6 Md. 49, "And although

evidence of usage is sometimes admissible to add to, or to explain the terms of an agreement, yet it will never be permitted to vary or contradict the clear and manifest signification of the terms which the contracting parties may think proper to employ to express their meaning." By the express terms of the London contract the usage or custom invoked by the appellees, is excluded. If the bill of lading weights are final and conclusive according to the custom, how can that custom be imported into the contract in the face of the explicit provision that "any deficiency on bill of lading weights to be paid for by seller?" The custom set up is absolutely inconsistent with the contract, and can only constitute a term of that contract by expunging a diametrically opposite term. When the parties to the contract have distinctly agreed that the bill of lading weights shall *not* be final—as they have done by stipulating who shall be liable if the weights are erroneous—a custom that they *shall* be final, cannot override the contract, because such a custom is flatly inconsistent with the contract. There was error, thefore, in granting the appellees' fifth prayer and in rejecting the appellants' first prayer. The appellants' third prayer should have been granted. It told the jury that if the whole amount of grain called for by the contract—viz: the three thousand quarters—was not in fact delivered by the railroad company at its elevator to the steamer "Indore," then the surrender by Gill & Fisher of elevator receipts calling for that quantity of corn, is, under the pleadings, no defence to this action. The proposition announced is self-evident. If the quantity of grain for which Gill & Fisher were paid was not delivered to their vendee, then, their surrender of the warehouse receipts did not relieve them from their liability to their vendee for the shortage in delivery. . We do not discover any error in the rejection of the appellants's fourth prayer. It undertook to define the rights of Gill & Fisher against the railroad company, but as the rights of the former against the latter and the liabilities of the latter to the former with respect to the alleged shortage in the weight of the corn, are not in any way involved in the pending case, they were not matters

with which the jury had any concern.　The appellants' fifth
prayer was correct and ought to have been granted.　It merely
told the jury that the appellants had no cause of action against
the railroad company on account of the shortage, as there was
no contract between that company and them.　The appellees'
first prayer related to the burden of proof and was properly
granted.

It results from what has been said that the judgment in favor
of the appellees must be reversed because of the errors com-
mitted in sustaining the demurrer, in granting the appellees'
fourth and fifth prayers and in rejecting the appellants first,
second, third and fifth prayers, and a new trial will be awarded.

*Judgment reversed with costs above and*
*below, and new trial awarded..*