NATHANIAL A. RICE, TRADING AS A. RICE & COMPANY.

*vs.*

MARION G. DINSMORE, TRADING AS T. M. DINSMORE
& COMPANY.

*Sale of goods: on trial; rejection; reasonable time; Code, Art.
83. Prayers: misleading; inconsistent theories.
Evidence: non-reversible errors.*

Under Article 83 of the Code of 1912, upon a sale and delivery of goods, on approval, unless a time be fixed, within which notice of rejection may be given, such notice, to be effective, must be given within a reasonable time; and if the purchaser retains the goods an unreasonable time, without giving such notice, he becomes liable therefor.　　　　　　　　　p. 281

The ruling of a Court upon exceptions to evidence can present no reversible error, when testimony as to the facts sought to be proved by such evidence was admitted elsewhere during the trial.　　　　　　　　　　　　　　　　p. 282

Error in granting a prayer of one of the parties, which does not state correctly the legal principles applicable to the case, is

not corrected by a prayer granted at the instance of the other party which states the law correctly as to his conflicting theory of the case. p. 282

*Decided October 28th, 1914.*

Appeal from the Superior Court of Baltimore City. (DAW-KINS, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CON-STABLE, JJ.

*Charles F. Harley* (with *Harley & Whelte* on the brief), for the appellant.

*George Washington Williams* and *John Holt Richardson,* for the appellee.

BURKE, J., delivered the opinion of the Court.

This is an appeal by the defendant from the judgment rendered against him in the Superior Court of Baltimore City in a suit instituted against him in that Court, by Marion G. Dinsmore, trading as T. M. Dinsmore & Company.

The declaration contained the common counts only, and the suit was brought under the Speedy Judgment Act. The account filed with the *narr.* showed that the cause of action was for feed, amounting to $698.74, sold and delivered by the plaintiff to the defendant.

The defendant admitted the correctness of the account, but claimed, by way of set-off, that the plaintiff was indebted

to him in the sum of $350.00, being the purchase price of a horse alleged to have been purchased from him by the defendant. The defendant admitted in the affidavit to his pleas that he owed the plaintiff the sum of $348.74, that being the difference between the purchase price of the horse and the account sued on, and that sum was paid to the plaintiff.

The only question, therefore, involved was whether the defendant was entitled to an allowance for the agreed price of the horse.

It was admitted by both parties that the agreed price of the horse was $350.00, and it was shown that the horse was a fine animal and perfectly sound.

The plaintiff contended that the horse was sold to him "on trial," and, having died in his possession under the circumstances hereinafter stated, he was under no obligation to pay for him.

The contention of the defendant was that there had been an absolute sale and delivery of the horse to the plaintiff.

The following facts, appearing in the record, are all that need be stated to dispose of the legal questions presented by this appeal. About the first of March, 1912, the plaintiff, who is a retail dealer in hay, grain and feed, decided that he needed a horse to be used in connection with his business. The defendant is a dealer in horses, and the plaintiff asked Doctor Nolan, a veterinary surgeon, to see if the defendant had a horse suitable for his use, and if he had to let him know. Doctor Nolan visited the defendant's stables and selected from a number of horses one which he thought would suit the plaintiff. He had this horse set apart for the inspection of the plaintiff. On Thursday following the visit of Doctor Nolan to the defendant's place of business, the plaintiff came to the stables, examined the horse, agreed with the defendant upon the price and had the horse sent to his place of business. The horse was taken sick on the following Sunday and died from congestion of the lungs on Wednesday following. The plaintiff testified that he told the defendant

to send the horse around and he would use him, and if he suited, he would keep him. The plaintiff gave the following account of the horse after he came into his possession and of his own acts in relation to him: "On Thursday the horse was sent out, and on Friday the weather was very bad and we did not work him. Saturday the weather was not much better, but we did not want the horse to be standing up, so we worked him about five or six hours that day. It is customary in a case of that kind for me to go over the horse with one of the men who is practical, who has practical knowledge along that line, and I thought it was no more than right and fair for me to telephone Mr. Rice to tell him that I had not been at the store that day, and that I had not had an opportunity to go into the question of whether the horse was all right or not. 'That is all right, Marion,' said Mr. Rice, 'I know he will suit you.' I said, 'All right, I will let you know Monday at twelve o'clock.' Mr. Rice's answer was, 'All right, Marion, that will be all right; I know that horse will fill your bill.' On Sunday the man at the stable called me up and said he had to send for Doctor Nolan because the horse was a little bit under the weather, that is he had a cold. I said that would be all right, that I would be down in Canton and I would stop at the stable and look the horse over. About three o'clock I got to the stable and I got Doctor Nolan's report, and he said that it was nothing serious, and I then called up Mr. Rice. I thought he ought to know the conditions. I told Mr. Rice about it and his answer was, 'That is all right, Doctor Nolan can do more than I can; he will do all he can with him.' On Monday the horse showed no change. Doctor Nolan at no stage of the game thought there was any serious trouble with the horse, that is up to within three or four hours of his death. The horse became slowly worse and on Wednesday, I think it was, the horse died. We reported that fact. Sometime after that I went in to see Mr. Rice. I told Mr. Rice that I did not think technically I owed him a penny, but on a moral ground———."

The testimony of the defendant as to the sale of the horse was as follows: Mr. Dinsmore said when he came to the stables on Thursday: "I would like to look at the horse that Doctor Nolan picked out." I went to the door and I hollered to the colored man to bring out the horse that Doctor Nolan had picked out for Mr. Dinsmore. They brought him out and he looked at him and asked me the price of him, and I told him it was $350.00. He dickered a little and asked me if I could not shade it a little, or words to that effect. He trotted the horse out on the street and he said, 'I like him, and I will take him; when can you send him down?' I said, 'Well, I have been holding him here since Sunday and I can send him right away,' and I called one of the boys and he got on his leading pony and he led the horse down."

This testimony was corroborated by the witness, Thomas H. Jones. The defendant denied that he had talked with the plaintiff over the telephone on Saturday as testified to by the plaintiff, and further said that the only telephone message that he had from the plaintiff before the death of the horse was on Sunday, and his version of that conversation differed materially from that given by the plaintiff.

At the close of the testimony the Court granted two prayers as follows:

*First*—The plaintiff prays the Court to instruct the jury that if they shall find from the evidence in the case that the plaintiff took the horse mentioned in the evidence "on trial," and that he, the plaintiff, was to let the defendant know later whether or not the said horse would suit him, and that the said plaintiff never at any time accepted said horse, then their verdict must be for the plaintiff.

*Second*—If the jury find from the evidence that the plaintiff bought outright from the defendant on or about March 7th, 1912, the horse mentioned in the evidence, and that the plaintiff did not merely take said horse on trial; then their verdict must be for the defendant, notwithstanding the death of the horse the following week.

The record contains two bills of exceptions by the defendant,—the first to the refusal of the Court to admit certain testimony, and to the action of the Court in granting the plaintiff's prayer.

The questions are whether under the facts stated, there was reversible error in either of these rulings. As the ruling upon the prayers presents the important question in the case that will be first considered.

It is stated in the brief of the appellee that the plaintiff's prayer "simply covers the plaintiff's theory of the case, namely, that the sale was a "sale on trial," and is but the converse of the defendant's prayer which we admit to be sound and beyond controversy."

It is provided by the Code of 1912, Article 83, Sec. 40, Rule 3 (2) as follows: "When goods are delivered to the buyer on approval, or on trial, or on satisfaction, or other similar terms, the property therein passes to the buyer:

(*a*) When he signifies his approval or acceptance to the seller, or does any other act adopting the transaction;

(*b*) If he does not signify his approval or acceptance to the seller but retains the goods without giving notice of rejection, then if a time has been fixed for the return of the goods, on the expiration of such time, and, if no time has been fixed, on the expiration of a reasonable time. What is a reasonable time is a question of fact."

In this case no time was fixed by the parties for the return of the horse and the plaintiff was bound to give notice of his rejection of the horse within a reasonable time, and if he retained the horse for an unreasonable time without giving notice of such rejection he can not escape liability.

It is not claimed that he gave notice of disapproval or rejection of the horse. He testified that he told the defendant he would let him know on Monday at twelve o'clock whether the horse suited. He did not do so, but kept the horse without disapproval or rejection until it died on the following Wednesday.

The prayer ignores the question of notice and makes the plaintiff's liability depend upon the question of the acceptance.

Manifestly, the prayer does not state the law correctly. Was it injurious to the defendant? It is contended that it was not, because the defendant's prayer authorized a verdict upon the same state of facts upon which the plaintiff's prayer "authorized a recovery;" that it was practically identical in effect with the defendant's prayer. We cannot assent to this contention. The defendant's prayer was predicated upon an absolute sale; that of the plaintiff upon a "sale on trial." The jury may have found that there was not an absolute sale of the horse, as claimed by the defendant, and yet he would have been entitled to a verdict if they found the sale to have been a sale on trial and should have further found that the plaintiff had not discharged the duty imposed upon him by the law. The prayer of the plaintiff misdirected the jury as to the law applicable to the facts and had an inevitable tendency to injure the defendant.

We find no reversible error in the ruling upon the first exception as the testimony sought to be introduced was subsequently testified to during the course of the trial. For the error committed in granting plaintiff's prayer the judgment must be reversed.

> *Judgment reversed and new trial awarded, the appellee to pay the costs above and below.*