# THE AGRI MANUFACTURING COMPANY, A Body Corporate,

## *vs.*

# ATLANTIC FERTILIZER COMPANY, A Body Corporate.

*Sales of goods: loss by fire pending delivery.   Usage: when proof not admissible.*

A sale of an undistinguished quantity of the seller's "regular production of ground tankage" is not a case of a sale of specific goods, within the meaning of section 29 of the Uniform Sales Act, Chapter 346 of the Acts of 1910, Code, Article 83, sections 22-98.                                                  pp. 46-47

Where, under a contract of sale of a quantity of fertilizer, it was the duty of the seller to make delivery at the buyer's factory, and pay the freight on the shipment, no question of transfer of title before delivery, according to section 41 of the Uniform Sales Act, arises.                                        p. 47

Where the terms of sale give to the purchaser, upon delivery, the right to have a chemical test made of the commodity sold, with the absolute right to refuse to accept the goods unless they meet the agreed test, it is a conclusive indication that title should not pass until the customary opportunity be afforded for making this test.                                        pp. 51-52

As applied to an offer of property under a contract of sale, the right to refuse to accept the property implies that title has not yet passed.                           p. 49

Proof of a usage inconsistent with the plain terms of a contract is inadmissible to vary or defeat its purport.       p. 52

Under a contract of sale, a certain number of tons of fertilizer material were sold to the purchaser, to be shipped to the purchaser's factory, freight prepaid by the vendor, the purchaser to have the right to refuse to accept the commodity unless it passed a certain chemical test to be made by him, and pending such test, while the cars loaded with the fertilizer were at the purchaser's works, awaiting such test, which the purchaser had not unduly delayed, the cars and fertilizer were destroyed by fire: *Held*, that the loss should fall on the vendor.       p. 52

*Decided May 17th, 1916.*

Appeal from the Superior Court of Baltimore City. (DUFFY, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Benjamin Beck* (with whom was *Arthur D. Foster* and *John Henry Skeen* on the brief), for the appellant.

*Alfred J. Carr* and *Adolph Schoeneis,* for the appellee.

URNER, J., delivered the opinion of the Court.

A carload of ground tankage for use in the manufacture of fertilizer, was sold and shipped by the appellant, the Agri

Manufacturing Company, to the appellee, the Atlantic Fertilizer Company, and was destroyed by fire before being removed from the car, and while awaiting official analysis and weighing at the appellee's works. The question raised by this suit is whether the loss thus occasioned should be borne by the vendor or by the vendee, neither of whom was at fault in regard to the destruction of the property. The terms of the agreement relating to the sale are set forth in a letter from the appellant to the appellee under date of October 21, 1913, as follows:

"Gentlemen: This will serve to confirm sale to you of about four hundred (400) tons of our regular production of Ground Tankage for approximate equal monthly shipments for months of January, February, March and April, 1914, at $2.67½ per unit for ammonia per ton of 2,000 lbs. cif. your works, Curtis Bay, Md. Delivered weights and sampling by Stallings, analysis by Wiley & Co., at seller's expense. Bags to be furnished by buyer as far as possible; if furnished by sellers they are to be returned promptly at buyer's expense.

"Terms, ¾ cash upon presentation of pro forma invoice and B/L, balance upon completion of weights and analysis.

"These goods are sold upon the representation by sellers that the availability of the nitrogen they contain will show at least 70% by a permanganate method. In the event buyers should have any goods analyzed for available nitrogen, an official sample to be used, and they should prove to contain less than the 70% availability above mentioned, the expenses of said analysis shall be paid by sellers and buyers shall have the privilege of refusing said goods.

"In all disputes, the sampling and weighing of Stallings and the analysis of Wiley & Co. to govern."

In the course of the deliveries under this contract a carload of ground tankage, estimated to contain about thirty

tons, was shipped, on April 20, 1914, over the line of the
Baltimore and Ohio Railroad, from Mt. Claire, Baltimore,
to the appellee's factory at Curtis Bay. The car reached the
siding of the Atlantic Fertilizer Company on the afternoon
of Friday, April 24th, and upon an order issued by the
superintendent of the company it was placed in position the
following day for unloading. Notice was sent by the com-
pany to Mr. Stallings and to Messrs. Wiley and Company to
be at its works on Monday morning, April 27th, to weigh
and analyze the contents of the car as provided by the agree-
ment. On the intervening Sunday a fire occurred at the
appellee's plant and the flames consumed the carload of
fertilizer in question as it stood on the siding adjacent to
the factory. The bill of lading for the shipment, in which
the Atlantic Fertilizer Company was named as consignee,
had been previously delivered to it by the sales manager
of the vendor company, together with a *pro forma* invoice,
upon which he received a payment of $661.00 representing
three-fourths of the estimated value of the material on the
basis of the ammonia content assumed by the contract of sale.
In this suit the vendor seeks to recover from the vendee a
balance of $240.86 for the shipment referred to, and the
sum of $203.88 on account of a carload which was delivered
after the fire and upon which also a three-fourths payment
was made on presentation of the bill of lading and *pro forma*
invoice.

The defendant filed general issue pleas to the declaration,
and in addition interposed a plea of set-off claiming recovery
from the plaintiff of the amount advanced on the carload
destroyed, less the sum alleged and admitted to be due on
the second car, and plus the freight charges of $7.95 paid by
the vendee on the two consignments. There was no dispute
as to the correctness of the figures upon which the opposing
claims were based, and it was conceded in effect that if the
plaintiff company was entitled to recover, the verdict in its
favor should be for the sum of $444.74, otherwise the find-
ing should be for the defendant, on its claim of set-off, to the

amount of $461.62. At the close of the plaintiff's case the trial Court granted an instruction to the jury that there was no legally sufficient evidence to support a verdict for the plaintiff and that they should find in favor of the defendant for the sum just indicated. From the judgment entered upon the verdict thus directed the plaintiff has appealed.

The principles which must control the decision of the question raised by exception to the instruction to which we have referred are embodied in the Uniform Sales Act, whose provisions were enacted as part of the statute law of this State by the Acts of 1910, Chapter 346 (p. 272), and are codified as sections 22 to 98, inclusive, of Article 83 of the Code of Public General Laws. By section 43 of the Act it is provided: "Unless otherwise agreed, the goods remain at the seller's risk until the property therein is transferred to the buyer, but when the property therein is transferred to the buyer, the goods are at the buyer's risk, whether delivery has been made or not." There is an exception stated to this general rule, but it is not pertinent to the present inquiry. Section 39 declares the rule in reference to the transfer of title to the goods sold, as follows: "(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intended it to be transferred. (2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case." It is provided by section 29: "Where there is a contract to sell specific goods, and subsequently, but before the risk passes to the buyer, without any fault on the part of the seller or the buyer, the goods wholly perish, the contract is thereby avoided."

Specific goods, as defined by the Act, are "goods identified and agreed upon at the time a contract to sell or a sale is made." The sale in this case was not of specific goods, as it related to an undistinguished quantity of the seller's "regular production of ground tankage." Rule 4 of section 40,

however, provides: "Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller, with the assent of the buyer, or by the buyer, with the assent of the seller, the property in the goods thereupon passes to the buyer. * * * Where in pursuance of a contract to sell, the seller delivers the goods to the buyer, or to a carrier or other bailee (whether named by the buyer or not), for the purpose of transmission to or holding for the buyer, he is presumed to have unconditionally appropriated the goods to the contract, except in the cases provided for in the next rule and in section 41. The next rule is as follows: "If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon." Section 41 to which the exception noted in Rule 4 of section 40 refers, is concerned with conditions which have no relation to such an issue as the one now presented.

In the case before us the seller contracted to deliver 400 tons of fertilizer, of the kind and quality described, at the buyer's works. The term "cif your works," as used in the agreement, is shown by the testimony to mean that the seller should pay the cost, including freight, incurred in the transportation. The material shipped and destroyed by the fire was appropriated by the seller to the contract, but as it was the duty of the seller, under the terms of the sale, to make delivery at the buyer's factory, and to pay the freight on the shipment, the rule last quoted precludes any question as to the transfer of the title before the delivery at the designated place was accomplished. It is, therefore, unnecessary to consider what, in the absence of such a stipulation, is the ordinary effect upon the title of delivering goods to a common carrier and of consigning them to the buyer upon a bill of lading issued in his name, and of the payment of part of

the purchase money.    Whether the title to the specific car-
load of fertilizer under inquiry passed to the buyer as soon
as it reached the place of destination depends upon the ques-
tion as to whether the parties to the sale intended the trans-
fer of the title to occur at that point of time or to be de-
ferred to a later period.    The intention of the parties is the
controlling factor in the determination of such an issue.    This
is the plain import of the provisions we have reproduced
from the Uniform Sales Act, which simply declare in this
respect the settled rule of the common law.    *Lucas* v. *Taylor,*
105 Md. 107.

Upon the question of intention in regard to the time when
the title should pass we have nothing in the record of any
special significance beyond the written terms of the sale.
There were no acts of the parties reflecting upon this subject
except such as the agreement evidently contemplated.    The
issue to be decided is therefore one of law and involves the
inquiry as to whether there are any conditions of the con-
tract which had the effect of postponing the transfer of the
title to the defendant beyond the time of the arrival of the
shipment at its plant.    It is clear that this effect would not
necessarily be produced by the provision for weighing and
analysis to ascertain the quantity of the material and the
units of ammonia it contained for the purpose of correctly
determining the amount of the price.    The decision of this
Court in the case of *Farmers' Phosphate Co.* v. *Gill,* 69 Md.
537, is conclusive upon this point.    Numerous cases in har-
mony with that ruling are cited in a note to *Deadwyler* v.
*Karow,* (Ga.), 19 L. R. A. (N. S.) 197, upon the subject of
the effect on sales of the destruction of the property after
actual or constructive delivery, preventing the ascertainment
of the price according to the terms of the contract.

The sale was made, however, upon the representation that
the ground tankage contained 70% of available nitrogen, and
it was stipulated that if the buyer should "have any of the
goods analyzed" for that element, using an official sample,
and the nitrogen availability should prove to be less than that

specified, the buyer should have "the privilege of refusing said goods." It appears from the record that the practice in reference to the shipments under this contract was to first make the tests to ascertain the units of ammonia per ton, from which results also it could be approximately determined whether there was 70% or more of available nitrogen present, and the Atlantic Fertilizer Company would then decide whether it wanted a further nitrogen test made by the permanganate method. The representation as to the availability of nitrogen was treated by the parties as being sufficiently material to entitle the buyer to refuse any shipment which was found to be deficient in that respect when the fertilizer was weighed and analyzed on delivery. The test provided in this connection was not to be made, and hence the buyer's conditional right of rejection could not be exercised, until after the shipment to be examined had reached its destination and had become subject to the buyer's control pending the process of unloading and weighing and making the analysis. Consequently, the fact that a particular carload had arrived on the buyer's siding and had been placed by its order in a position to have the cargo discharged, can have no important bearing upon the question as to the effect upon the title of the provision in reference to testing and rejection. The decisive inquiry is whether the right to refuse the shipment if a stipulated analysis at the time of delivery demonstrates that it does not conform to the contract, is consistent with the theory that the title has already passed to the purchaser. A refusal is a rejection of something proposed or tendered. It is a declination to accept. *Webster's New International Dictionary.* As applied to an offer of property under a contract of sale, the right to *refuse* the property obviously implies that the title has not yet passed. When the parties to the sale in this case agreed that the buyer should have the privilege of refusing any consignment of fertilizer which proved upon official analysis at the time of delivery to be deficient in respect to the quality warranted, they are necessarily presumed to have understood and intended that the

title should vest in the purchaser only in the event that the analysis should verify the warranty, or the right to require such a test should be waived. These were made alternative conditions precedent to the acceptance of the property.

It was said by this Court in *Enterprise Mfg. Co.* v. *Oppenheim,* 114 Md. 399, by way of quotation from *Pope* v. *Allis,* 115 U. S. 363: "When the subject matter of the sale is not in existence, or not ascertained at the time of the contract, an undertaking that it shall, when existing, or ascertained, possess certain qualities, is not a mere warranty, but a condition, the performance of which is precedent to any obligation upon the vendee under the contract, because, the existence of these qualities, being part of the description of the things sold, becomes essential to its identity, and the vendee can not be obliged to receive and pay for a thing different from that for which he contracted."

The Uniform Sales Act provides, by section 68 (1): "Where goods are delivered to the buyer, which he has not previously examined, he is not deemed to have accepted them unless and until he has a reasonable opportunity of examining them for the purpose of ascertaining whether they are in conformity with the contract."

A sale on terms permitting rejection of the goods if they do not pass a prescribed test of quality is somewhat analogous to a sale on trial, in reference to which the Uniform Sales Act provides, in section 40 Rule 3 (2): "Where goods are delivered to the buyer on approval, or on trial, or on satisfaction, or other similar terms, the property therein passes to the buyer: (*a*) When he signifies his approval or acceptance to the seller, or does any other act adopting the transaction; (*b*) If he does not signify his approval or acceptance to the seller, but retains the goods without giving notice of rejection, then if a time has been fixed for the return of the goods, on the expiration of such time, and if no time has been fixed, on the expiration of a reasonable time." This provision was applied in *Rice* v. *Dinsmore,* 124 Md. 276.

In *Farmers' Phosphate Co.* v. *Gill, supra,* where an agree- ment that a shipment of rock phosphate should be weighed and its quality tested upon arrival at the buyer's works was held not to defer the passing of the title until these acts were performed, it was pointed out that the buyers were given by the contract "no right to reject the rock if it did not come up to the prescribed standard," but were simply allowed in that event a proportionate abatement of the price.

The absolute right conferred upon the buyer in this in- stance to *refuse* the material delivered if it did not meet the test agreed upon is a conclusive indication that the title was not intended to pass to the buyer until the customary op- portunity for making the test was afforded. There is noth- ing in the evidence tending to show that there was any undue delay on the part of the buyer in arranging for the weighing and analyzing of the contents of the car on the occasion in question, and as the property was destroyed without fault of either party before the buyer's unqualified right to test, and his conditional right to refuse, the shipment could be exercised, we must hold that the instruction of the trial Court placing the loss on the seller was properly granted.

Since the issue here decided is controlled by the intention of the parties as disclosed by the special agreement and facts in the case, it would be of no advantage to review the various cases cited in argument which apply the same general rules of law but are concerned with materially different conditions.

The conclusion we have stated indicates also our approval of the rejection of prayers offered by the plaintiff proposing to submit the issue to the jury upon theories which are in- consistent with the principle of our decision and the views we have expressed.

There were nine exceptions to rulings upon questions of evidence. The first and second referred to offers of testi- mony as to the legal effect upon the title of the delivery of the bill of lading to the defendant, and of the weighing and analyzing of the fertilizer. These were purely questions of law and were properly disallowed. The third and fourth

exceptions were reserved to the refusal of the Court to admit proof as to the analysis of the ground tankage shipped under the contract other than the carload lost in the fire. The possibility of the separate shipments varying substantially as to their ammonia and nitrogen contents was distinctly recognized by the provision for sampling and analysis in the case of each consignment. The right given the buyer, therefore, to have any individual carload tested specially for nitrogen before acceptance could not be affected by the mere fact that other cargoes were of standard quality. No error was committed, therefore, in the exclusion of the proffered testimony.

The fifth and ninth exceptions were taken to the rejection of an offer to show that, according to the custom of the trade, a provision like the present, for analyzing the fertilizer, does not prevent the passage of the title. This ruling was proper. The question as to the title is determined in this case by the plain terms of the contract into which the parties entered, and proof of usage inconsistent with the legal effect of their agreement is inadmissible. *First Nat. Bank* v. *Taliaferro,* 72 Md. 164; *Birely* v. *Dodson,* 107 Md. 235; *Denton* v. *Gill,* 102 Md. 406; *Parks* v. *Griffith & Boyd Co.,* 123 Md. 245; *Furness-Withy Co.* v. *Randall,* 124 Md. 109.

The evidence to which the sixth exception refers as being excluded was subsequently admitted without objection. The seventh and eighth exceptions were unimportant and it is sufficient to observe that the rulings upon them were correct.

*Judgment affirmed, with costs.*