## DAVIS v. FERGUSON SEED FARMS.
### (No. 963.)

(Court of Civil Appeals of Texas. Beaumont.
Oct. 23, 1923. Rehearing Denied
Nov. 21, 1923.)

**1. Appeal and error ⊂⇒927(7)—In reviewing the direction of a verdict evidence must be considered most favorably to appellant.**

In determining the propriety of directing a verdict, the evidence must be considered most favorably to appellant, disregarding conflicts and contradictions.

**2. Trial ⊂⇒143—Where evidence tends to support the allegations of petition, issue should be submitted to jury.**

Plaintiff, having introduced evidence tending to support the allegations in his petition, was entitled to have the same submitted to the jury, no matter how much in conflict the contradicting evidence may have been.

**3. Trial ⊂⇒139(1)—To direct a verdict, evidence must be such that but one conclusion can be drawn from it.**

If a petition states a cause of action, for the court to take the case from the jury, the evidence must be such that there is no room for ordinary minds to differ as to the conclusion to be drawn from it.

**4. Sales ⊂⇒273(3)—Article bought for a special use and for a sound price is impliedly warranted suitable.**

Generally, where a buyer discloses to the seller that the article is intended for a special use and the seller sells it to the buyer for that purpose and for a sound price, he impliedly warrants that the article is suitable for that purpose and free from hidden defects that would impair it for such use; the rule being especially applicable where the seller is the producer or manufacturer of the article sold.

**5. Sales ⊂⇒445(2)—Whether there was a warranty of seed held for the jury.**

In buyer's action for breach of warranty of fertility of cotton seed, whether there was such a warranty *held* for the jury.

**6. Sales ⊂⇒260—Warranty of seed effective irrespective of printed disclaimers.**

A warranty of fertility of cotton seed should be given effect, irrespective of printed disclaimers on the invoice and shipping tags.

**7. Sales ⊂⇒442(11) — Buyer may recover against seller for breach of warranty irrespective of his liability to his customers.**

Where seed were warranted to be fertile and the buyer sold them to his customers with a like warranty, the buyer could recover from seller for breach of warranty, though he had resold the seed and had not refunded any sum to his customers and no claim against him had been made.

**8. Sales ⊂⇒442(13)—Amount received by buyer has no bearing on his right to recover against seller.**

In an action to recover damages against a seller for breach of warranty, the amount received by buyer on resale has no bearing on his right to recover against the seller, except as evidence of the actual value of the property furnished.

**9. Sales ⊂⇒440(2)—Evidence as to existence and scope of warranty held admissible.**

In buyer's action for damages for breach of warranty of fertility of seed sold, evidence of seller's catalogue, the invoice and shipping tags, limiting seller's liability for damages in the event the seed failed to germinate, *held* admissible upon the question of what was the contract and whether the seed was sold with a warranty.

Appeal from District Court, Navarro County; Hawkins Scarborough, Judge.

Action by Guy Davis against the Ferguson Seed Farms. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

Richard Mays and A. P. Mays, both of Corsicana, for appellant.

Chas. Batsell, of Sherman, and Callicutt & Johnson, of Corsicana, for appellee.

O'QUINN, J. Appellant sued appellee for damages alleged to have resulted from a breach of contract by appellee to deliver to appellant sound and fertile cotton seed, which appellee knew were to be used by appellant for the purpose of resale to farmers for planting purposes.

Appellant alleged, in substance, that on October 29, 1918, he contracted with appellee for the purchase of 400 bushels of cotton seed at $2.50 per bushel, and that in pursuance of an understanding then had, the order, on November 21, 1918, was increased to 1,100 bushels; that at the time of making the contract for the seed, appellee was engaged in raising and selling seed for planting purposes, and that appellant, though not a dealer in seed, was engaged in operating cotton gins, and bought said seed for the purpose of reselling same at cost to farmers who were customers of his gins, to improve the grade and staple of cotton, as well as to increase the patronage of his gins, which purpose of appellant was well known to appellee, and that in so doing, appellee undertook to aid him, and expressly and impliedly warranted that said cotton seed would be sound, would germinate, and would, in every way, be fit for planting purposes; that after said seed were delivered to appellant, he resold practically all of said seed to his customers, at cost to him, who, in due time, planted said seed in various parts of the territory around Dawson, Tex., and in various soils, and that said seed, with but few exceptions, failed to germinate, and thus caused a loss to said customers in the sum of $4,000, for which appellant is liable, and which he will be forced

to reimburse; that in addition to said loss to said customers, for which he is liable and will be forced to make good, he sustained damages in the amount of the purchase price paid appellee for said seed, in the sum of $2,750, besides $95 freight, and $6 exchange on the amount of the draft drawn on him by appellee for the purchase price of said seed, and the further sum of $2,500 damages sustained to appellant's ginning business as a result of loss of custom and trade among those to whom he had sold said seed.

Appellee answered by general demurrer, special exception, general denial, and specially that while the seed were sold by it to appellant, they were neither expressly nor impliedly warranted, and that appellee's liability on the contract of sale was controlled by what it denominated its "Stringless Guarantee," under which appellee alleged no warranty, express or implied, was given; that under the contract of sale appellee would not be liable unless within ten days after the seed reached appellant a germination test was applied by appellant, and, which appellant having failed to perform, appellant had waived all right to recover damages by reason of the infertility of the seed developing thereafter.

In his supplemental petition, appellant denied that the "Stringless Guarantee," contained in appellee's catalogue and printed on the invoice and shipping tags, entered into or was a part of the contract of purchase, and denied that he ever made a contract to purchase the seed without warranty, express or implied, and denied that he ever agreed to purchase said seed as per the "Stringless Guarantee" asserted by appellee, or the ten-day germination test pleaded by appellee, but that said contract was made and said seed were bought without any such understanding.

The case was tried before a jury, and at the conclusion of the evidence the court instructed the jury to return a verdict for appellee, upon which judgment was rendered, and from which plaintiff appealed.

The record discloses that appellant was in the gin business at Dawson, Navarro county, Tex., and that it had been and was his custom to buy improved cotton seed and resell same to farmers in that vicinity at a small profit, for the double purpose of improving the grade and yield of the cotton and to make more profitable his ginning business; that on October 28, 1912, the appellant wrote appellee as follows:

"Guy Davis Gin.

"Dealer in Cotton & Cotton Seed.

"Dawson, Texas.  10/28/18.

"Ferguson Seed Farm, Sherman, Texas:

"Dear Sirs: Regarding recent correspondence with you, will say that I want about 200 bushels of the Lone Star cotton seed providing they are of best grade. But will ask that you hold order a day or two, as we are figuring on making up a car of other seed including cotton seed.

"Please write me at once if this would be satisfactory with you? Also will you stand behind the Lone Star cotton seed as being of best grade?

"Hoping to hear from you at an early date, I remain,

"Yours very truly,  Guy Davis."

In answer to this letter, appellee wrote appellant, and sent one of its salesmen, Sam C. Johnson, to see appellant. Appellant, after talking the matter over with Johnson, gave him the following order:

"Ferguson Seed Farms.

"Sherman, Texas.

"Order No. 207.          Date, Oct. 29th, 1918.
"Sold to Guy Davis
"Ship to Dawson, Texas.
"How Ship  Freight     When, Jan. 1st, 1918.
"Terms, Draft B/L attached.
"Cash payable at Sherman, Texas, in New York or Sherman Exchange.

| Quantity | Class and Variety | Price |
|---|---|---|
| 300 | Bu Lone Star Reg | $750.00 |
| 100 | Bu Mebane Triumph Reg. | 250.00 |

"F. O. B. Sherman
"Draft to Liberty National Bk.  Dawson, Tex.  (c)
"Send samples of Mebane & Lone Star Seed at once.  Cash Received on this Order.
"All conditions must be expressed in writing. No verbal agreements recognized. This order is taken subject to approval of Ferguson Seed Farms at the office of the company at Sherman, Texas.

                    "Guy Davis, Buyer.
                "(If a corporation, so state.)
                         "By: ——————.
"Samples of Mebane and Lone Star for Gin at Dawson and Gin at Purdon.
"Approved at Sherman, Texas
                    "Ferguson Seed Farms
          "By: Sam C. Johnson, Salesman.
"Ferguson Seed Farms
   "By: ——————."

This order was duly acknowledged and confirmed, as follows:

"A. M. Ferguson, Sherman, Texas.
                    "October 31, 1918.
"Guy Davis Gin Co., Dawson, Texas.
"Gentlemen: We appreciate very much the order which you gave us under date of October 29 through our field representative, Mr. Sam C. Johnson, for 300 bushels Lone Star and 100 bushels Mebane Triumph cotton seed.
"We are confirming this order just as it was written for January 1 delivery and enclose our acknowledgment to cover. Please advise us if this acknowledgment is not correct in all particulars as its duplicate will serve as instructions to our shipping department.
"We are mailing you samples of our Lone

Star and Mebane Triumph, also our Ferguson No. 71 Oats and Fulcaster seed wheat.

"With kind regards, we are

"Sincerely yours,      Ferguson Seed Farms,
                        "By B. C. Pittuck.

"BCP:KD.

"Acknowledgment,

"Lone Star

"Mebane Triumph

"Fulcaster wheat.

"No. 71 Oats #392."

On November 16, 1918, in answer to a letter from appellant inquiring as to the freight rate on carload lots, and also the price of seed by the carload, appellee wrote appellant as follows:

"(On letter-head of Ferguson Seed Farms.)

"Sherman, Texas, November 16, 1918.

"Mr. Guy Davis, Guy Davis Gin, Dawson, Texas.

"Dear Mr. Davis: Yours of November 10 to hand in regard to the rates on cotton seed. The carload rate is just the same the year round, but on local shipments, we get a reduced rate if the shipment is made after January 15. If you contemplate increasing your order to a carload, it can come out just as cheap now as it can at any other time. The carload rate, of course, is quite reasonable, and the local rate is not so very high. Just off hand, I do not know what the rates are to Dawson, but I will try and have them looked up so as to advise you of the approximate rate on both local and carload lots, as a postscript to this letter. The rate is based upon the mileage entirely.

"We are mailing you another copy of our catalog which will give you a description and a reference to the two grades of both the Lone Star and Mebane Triumph cotton seed. The extra special pedigreed and the regular certified pedigreed seed.

"To arrive at the prices on these two different grades of seed in carload lots, take the lowest price quoted in the catalog and then subtract 25¢ per bushel and you will have the full discount. The lowest price quoted in the catalog on the regular certified seed is $2.75 per bushel. By taking the 25¢ off you will get the $2.50 per bushel, which is the price at which your order is booked.

"However, Mr. Davis, the intention is now that on or about December 1, to advance our wholesale prices 10¢ per bushel and we just merely want to remind you of it so that if you are contemplating adding to your order, it would be well for you to do so before December 1.

"All cotton seed which we sell are raised directly from the seeds which we have produced, they are grown under our supervision, ginned at our own gin and we stand back of them in every particular. You will find this matter fully explained in our catalog. If there is anything therein that is not perfectly clear, we shall be glad to hear from you and will take pleasure in answering your questions.

"Mr. Davis, Ferguson Seed Farms does not go out and buy any cotton seed from anyone. All our seeds are our own creations and represent improved strains which have been developed in our own breeding blocks.

"And what is more to the point, they *are* improved. To substantiate this statement, we

255 S.W.—42

do not ask anyone to take our declarations in the matter. The information given on page 13 of our catalog and elsewhere, offers very substantial proof that our seeds have been bred to yield, and bred to make a good turnout at the gin. These are important points and mean much to the profits of the farmers' cotton crop.

"Any farmer, who will stop to figure just what these extra yields mean, can see that it does not make any difference what kind of seeds he has, unless he has some late specially improved strains, it will pay him to plant some of our pedigreed seeds. We are mailing you a half a dozen copies of our spring catalog. If you need more, let us hear from you.

"It would probably be just as well if you would send us a list of 75 or 100 farmers in your territory. We could mail out catalogs to them directly and put a note on the catalog that same had been sent at the request of 'Guy Davis Gin Company.' This is the way we do for parties who are buying carload lots.

"Awaiting your further instructions, we remain

"Most sincerely yours,
                        "Ferguson Seed Farms,
"AMF/WAF
"6 S. Catalogs.
                        "By A. M. Ferguson."
                        "WAF.

"P. S.—We are advised by the Cotton Belt here that the carload rate on cotton seed from Sherman to Dawson is 17¢ a hundred and that the local rate is 79¢ a hundred.  F. S. F."

Upon receipt of this letter of November 22, 1918, appellant increased his order previously given to 1,000 bushels of Lone Star seed and 100 bushels of Mebane seed, and asked that same be shipped at once, instead of on January 1, 1919, as provided in the original order, which increase in said order was accepted by appellee in a letter of confirmation to appellant of date November 27, 1918, and the seed shipped on December 3, 1918. The acknowledgment of said order reads:

"Acknowledgment of Order

"Ferguson Seed Farms, Sherman, Texas,
                        "Date 11–27–18.

"This Order Will be Given Attention as soon as we can get car. By the Shipping Department.  K. D.

Name: Guy Davis Gin.
To be forwarded by freight.
Freight Station: Dawson
                        Name of R. R.:  Cotton Belt.
County: Navarro.      State: Texas.

"We have received your order of 11–22–18 by letter. We are deferring shipping the following articles until we can get car. On account of ————

| Bags. | Bush. | Articles. | Weight. | Price. | Amount |
|-------|-------|-----------|---------|--------|--------|
|       |       |           | of Lbs. |        |        |
| 250   | 1000  | Lone Star Cotton Seed. | 32000 | 2.50 | 2500.00 |
| 25    | 100   | Mebane Triumph cotton seed. | 3200 | 2.50 | 250.00 |

Draft, B/L attached to Liberty National Bank.
Ferguson Seed Farms,      Total, $2750.00
    By  K. D.              Credit, $————."

In the notice of shipment (termed "Acknowledgment of Order and Notice of Shipment" on blank containing invoice of articles shipped), in the lower left hand corner, in fine print, was the following:

"While we exercise great care to have all our seeds pure, true to name and reliable, we give no warranty, expressed or implied, and will in no way be responsible for the crop. If the purchaser does not accept goods on these terms they must be returned at once, as provided in our Stringless Guarantee."

The "Stringless Guarantee" referred to appeared on the last page or back of cover of appellee's 1918 catalogue, and reads:

"Stringless Guarantee.

"Seeds must be satisfactory to *you* or you get your money back.

"Our certified seeds are sold for cash with order, sacked and delivered f. o. b. Sherman, but subject to examination and acceptance on arrival at your station. Ten days after arrival and at your station are allowed to make a germination test, look them over and decide.

"While we exercise great care to have all our seeds pure, true to name and reliable in every way, for obvious reasons, we do not give any warranty, expressed or implied, about the character of the crop. No reasonable man expects this.

"We Guarantee Safe Arrival of the seeds, but do not assume responsibility for delays, shortage, losses or damage caused by carriers.

"If Seeds Are Not Satisfactory: We want to be as liberal as could reasonably be expected. All we ask is that you carefully examine the seeds on arrival; if they are not satisfactory, or if you do not 'feel just right' about your investment, then have the goods promptly reshipped to us by freight in original bags.

"(Note: Your satisfaction is the *only* condition.)

"On return of the seeds we will refund your money without any 'ifs' or 'ands' or questions asked. Your judgment will be final and your *word* sufficient. Isn't this fair?"

Appellant, Guy Davis, among other things, testified:

"In the fall of 1918 I bought some cotton seed from the defendant, the Ferguson Seed Farms; I bought 1,100 bushels from them and paid for it. The first negotiations for the purchase of those seed, I think I wrote Mr. Ferguson that I would probably be in the market for some cotton seed, and I don't know whether he wrote me, or not; and Mr. Johnson came down there to see me. I mean Mr. Sam C. Johnson, the salesman for the Ferguson Seed Farms. * *. * Mr. Johnson said that Mr. Ferguson had talked to him about coming to see me to sell me some seed; had asked him to come to see me, that I was in the market for some seed; and we figured on it and talked about it, and about the grade of the seed and what kind of cotton it was, Lone Star and Mebane, and I asked him a good many questions in regard to the cotton, and I asked him if they guaranteed those seed as first-class, to be first-class and give good results, and he said he did, and I finally gave him an order for 300 bushels of Lone Star and 100 bushels of Mebane, with

the understanding that I could increase the order to a carload a little later, if I decided I could use a carload. It was mentioned between us what I wanted with those seed; wanted to sell them to my customers, the farmers, to plant; wanted them for planting purposes, and that was mentioned at the time. I mentioned to Mr. Johnson there at that time that I wanted the seed for that purpose, and I asked him particularly about the germination tests, and he said they guaranteed the seed to germinate at least 85% or more, and I asked him about not putting that in the contract and he said that that was fully covered by the guarantee that comes on the tag, the tag that comes on the sack. There were tags on the seed I bought, but I don't recall what the words were on the tags. * * *

"When I mentioned that about the germination, Mr. Johnson said it wasn't necessary to insert that in the written contract as to the germination guarantee because everything was covered by their stringless guarantee. A written contract in the form of an order was written out after these matters were agreed to between me and Mr. Johnson, and I signed it, I think; I retained a carbon copy and Mr. Johnson took the original. That order was for 400 bushels, 300 bushels of Lone Star and 100 bushels of Mebane. Later I got a confirmation of that order from the Ferguson Seed Farms. I later took up the question of increasing my order with the Ferguson Seed Farms, and it was increased to 1,100 bushels, and arrived as a carload lot from Sherman, Texas.

"At the time I made that contract with Mr. Johnson, nothing was said about catalogs; he said they guaranteed the seed. I don't remember him saying anything about the 'Stringless Guarantee' being contained in the catalogs. I will not say that he said it was a 'Stringless Guarantee,' but he said the seed were guaranteed, and that this guarantee covered the germination as well as the purity of the seed. If he had one of the circulars' or catalogs with him, containing that 'Stringless Guarantee' he did not show it to me. At the time I made that contract with Mr. Johnson, he did not have a bill of lading or invoice in which it was stipulated that no guarantee and no warranty was given as to those cotton seed, and nothing of that kind was mentioned. I don't recall the date exactly when I received that carload of seed, but I think it was around the first of January, 1919. Those transactions I have testified about occurred in the fall of 1918, and the seed reached Dawson about the first of January, 1919. Those seed were bought for use in the planting season of 1919. The carload of seed was shipped with bill of lading attached to draft on the Liberty National Bank, and to get the bill of lading I paid the amount of the draft. I don't recall the exact amount of the draft, but it was 1,100 bushels at $2.50 bushel, making $2,750, and an additional item of $6 exchange; that would be $2,-756 I paid the bank, and I also paid the freight, in the neighborhood of $100. * * * I sold the most of those seed to cotton planters around Dawson; I sold all of those seed except 40 or 50 bushels, maybe 60 bushels. * * * Those Lone Star seed that I sold did not germinate very well; the Mebane ger-

minated very well. I never had any complaint as to the Mebane seed. * * * Those 1,100 bushels should have easily planted 2,000 acres. I did not sell those seed at a profit. My reason or motive for handling those seed without profit was for the accommodation of my customers in the way of helping them improve their crops and make better turnouts; my motive was not altogether altruistic, as I expected it to make my gin business more profitable. * * * Those seed actually cost me $2.60 a bushel. * * *

"In two or three weeks after I signed the contract with Johnson for the seed, at their request I sent the Ferguson Seed Farms a list of names of people that I would probably sell to; that was before I received any of the seed, I think. Later, after it turned out that the seed were failing to germinate, I sent Mr. Ferguson a partial list of those whose seed had failed to come up; he requested that I do that, and I did it at his request. * * *

"After the cotton planting season of 1919, I took up with the Ferguson Seed Farms the adjustment of their liability on account of those seed; I think the first correspondence was early in May, 1919; as soon as the complaints began to come in, I called Mr. Ferguson over the telephone, and also wrote him a letter. I called him over the phone and told him there was considerable complaint about the seed not germinating, and I would be very glad if he would come down and see the situation just as it was, and he asked me to see them and ask them to give a little more time; he said the seed probably had not had time to come up, as it had been a little cold and the ground was rather moist. That was Mr. Ferguson who said that, and I put them off the best I could, and I think Mr. Ferguson wrote me a letter that day or probably the next day, confirming that telephone conversation. In that telephone conversation I think I told him about the indications it was going to be a pretty serious complaint, and I told him the second time that I would like for him to come down and see the situation just as it was, and he remarked: 'Oh, Hell, a lot of people don't know what seed ought to do and don't give them time to see what they are going to do,' and as well as I remember that was about the substance of the conversation. There was some correspondence after that, and in pursuance of that correspondence I went to see him personally at Sherman. I went from Dawson to Sherman to see him and Mr. W. N. Matthews went with me, and we had quite a conversation. * * *

"The effect of all this trouble on account of the seed was, I lost a great deal of ginning and there is some of it I have never gotten back. As near as I can determine, I lost the ginning of seven or eight hundred bales of cotton in 1919 as a result of that condition. In 1919 I think we got 35¢ a hundred net for ginning. At $6.50 a bale, the net profit to me would be about $3.00 a bale. Now in 1920 I would say that condition caused me to lose the ginning of four or five hundred bales. We got $8 or $8.50 a bale for ginning in 1920, on which I got the same net profit, about $3 a bale. The next season would be this season, and I have suffered from that same influence this season, to the extent of two or three hundred bales, I would say, * * * on which my net profit has been probably $2.50 or $2.75 a bale."

"Cross-examination: * * * The seed were carried out during the winter and spring to the various farms. I know of my own personal knowledge about the failure of those seed to come up, because I went out in the field. It usually takes about ten days for seed to show up well in the field after they have been planted, and I think it was about the first days of May, as well as I remember, that the first complaints began to come in about the seed; then I went and looked over some of the fields—that was some time after they had been planted. I have helped farm some. I did not make any test of those seed in December; I guess I could have tested them in December if I had had a germinator. I haven't found any way of testing them without a regular germinator; I never tried putting them in a room with a warm temperature, about like spring weather.

"Out of that shipment of seed, 1,100 bushels, I sold all except about 100 bushels. I sold about 900 bushels of the Lone Star and a hundred bushels of Mebane, which left about 100 bushels I didn't sell. I would have gotten $2,500 for the thousand bushels I sold, if I had collected it all. Yes, I sold the seed for cash, or on such credit as I was willing to take. I would have to make an estimate of how much I collected out of that $2,500; I probably collected half of it.

"Q. And the rest of that is still owing to you? A. They say they don't owe me; I don't know whether they do or not."

"Redirect examination: * * * After the telephone conversation with Mr. Ferguson in which he told me to get some of the farmers to plant say a hundred seed in a nice, warm place and see how many germinated, I did that myself and I got a number of other farmers to do so, and I sent some to the A. & M. College and sent some to Mr. Ferguson, at his request, as he was going to make a test also in his germinator at Sherman. Those tests at Dawson that I have knowledge of myself ran from 20 to 35 out of a hundred. * * *

"About half the value of those seed is still outstanding and has never been paid to me, and I don't expect that the people will pay for them, since they turned out like they did, and I don't figure on trying to collect it. * * *

"Recross examination: * * * The first I knew about this stringless guarantee that is involved here, Mr. Johnson told me that they had a guarantee that covered the germination as well as the purity of the seed. (Counsel here exhibits to witness the catalog and states that he is asking about the technical guarantee therein contained, and points it out to witness.) I think the first time I ever saw that instrument was when I was at Sherman; I think probably Mr. Ferguson showed me that, when Mr. Matthews and I went up there. I didn't know anything about it before I went to Sherman, and there was no occasion before then that would cause me to see or take notice of it. (Counsel exhibits to witness the invoice sent him for the shipment of cotton seed involved here.) I would not say that I remember receiving that invoice before I went to the bank to take up the draft and get the bill of lading; I would not say I remember receiving this invoice. I really think I got the original invoice through the mail, but I don't remember when I first saw this—I don't see all the mail that

comes. That invoice was not attached to the draft or bill of lading that came through the bank; it came to me separately through the mail, if it came at all. This document, or nothing like it, was attached to the draft and bill of lading when I went to the bank to take it up."

### W. N. Matthews testified:

" * * * I have lived at Dawson some forty odd years. I bought some of the cotton seed that Guy Davis got from the Ferguson Seed Farms, I think it was $64 worth; I forget the amount of the bushels. With reference to the fertility and germination of those seeds, it wasn't good; they didn't come up. As to the per cent. of those seed that germinated, it would be hard to make an estimate because it was such a small per cent. of them that came up. Oh no, they never came up near enough to start out to make a crop, and I planted more seed; plowed up that land and planted other seed. I never got any more seed of the same kind from Guy Davis to replant with in place of those that didn't come up; I think I got some from Guy of another kind. I got Lone Star seed from Guy at first, and I got Rowden seed from him the last time. After I bought the Lone Star seed from Guy Davis, I got a few letters from Mr. Ferguson; that was after I had received the seed and planted them and plowed them up and planted over; I think maybe it was in June I got a communication from him in regard to the seed. I don't remember that I saw any other test made of those Ferguson seed by any of my neighbors. I made a test; Mr. Davis suggested that I make a test. I just made a little trench in a box and counted 100 seed and put them in the box and covered them up about like I would with a planter, and moistened the dirt, and out of that 100 seed I think there were five plants came up, five of the seed sprouted.

"After the trouble came up about those seed, I went to see Mr. Ferguson at Sherman; I went with Guy Davis. I don't know all that was said and done up there at Sherman between Mr. Davis and Mr. Ferguson. I had a talk with Mr. Ferguson; I believe I broached the subject to him and told him we had come to adjust the matter and he went on and said to me that we would have to take into consideration the ground and the condition of the soil and so forth, and I told him about the test I had made, and so on, and he said, as well as I remember, that he was willing to adjust it in the right way, and I told him I wanted mine adjusted or I would have to sue Mr. Davis, and he said, 'Just sue,' and I told him I was not calling on him for the pay, that I was looking to Mr. Davis, and he asked me to go out and let him and Mr. Davis talk together, and I did, and I don't know what passed between them.

"I think it was in April I planted those seed; I don't know just what time in April because I didn't keep any record of it, but we generally plant about the 10th of April. I will say that it was done about the ordinary planting time; it was in rich land the seed were planted, and the weather conditions were such that the seed could have germinated and come up. There were times that spring when the weather conditions were such that seed would not have come up, but at the time I planted, they should have come up. I don't remember of any other complaints during that cotton planting season around Dawson as to seed other than the Ferguson seed. * * *

"Redirect examination: I planted about 30 acres with the Ferguson seed; at the same time I was planting the Ferguson seed, I was planting some other land with different cotton seed; I planted something like 130 or 140 acres with other cotton seed. I had no trouble about those other cotton seed germinating, and did not have to plant them over."

### Spart Berry testified:

" * * * Along in the spring of 1919 I bought some Ferguson cotton seed from Guy Davis; I really don't know the exact quantity now, but it was some four or five sacks, something like that. Part of those seed came up and part of them didn't; that was the Lone Star seed I bought from Guy Davis. I would plant one sack in planting, and maybe that sack would come up pretty well and out of the next sack maybe you wouldn't get any to come up, hardly. The stand that I got out of those seed was not such that I could pitch a crop on and I had to plant them over; I planted over with a different kind of seed. About the time I planted those Ferguson cotton seed I also planted other seed on my land, on other land. I did not have any trouble with the other seed as I had with the Ferguson seed; I got a good stand from the other seed. I got a good stand also from the seed I replanted in place of the Ferguson seed. * * * "

### Will Roloff testified:

" * * * I think about 1918 or 1919 I planted some of the Lone Star cotton seed handled by the Ferguson Seed Farms; I don't recall how many bushels of those seed I bought, whether it was nine or ten bushels. I sent the order myself direct to the Ferguson Seed Farms at Sherman, Texas. I never bought those seed through Mr. Davis. I planted those seed I got from the Ferguson Seed Farms; I planted them the last of April or the first of May, along about the ordinary cotton planting time. The result I had with those seed as to germinating, I would call it pretty sorry; I didn't get any good stand and had to replant a good deal. There were a good many skips I had to replant, and some rows I had to plant over entirely. Where there was a large skip, I throwed in other seed by hand. * * * I planted Rowden right by the side of the Ferguson seed and had no trouble in getting a good stand from the Rowden seed. * * * "

### S. J. Swinney testified:

" * * * I live at Dawson and have been living there about 15 years. I don't know exactly what time it was, but I believe it was in 1919, I bought some Lone Star cotton seed from Mr. Guy Davis at Dawson. I can't say for certain how many bushels I bought, but to the best of my recollection I got three sacks; I mean I got three sacks at one time and then went back and got another one to replant with. I didn't have any success with those Ferguson seed. * * * At the request of Mr. Davis, I made a test of those seed; I went out in the front yard in my wife's flower bed—she didn't want me to do it—and I reached down in the sack and pulled out a handful and counted out

a hundred seed and opened a furrow and dropped my hundred seed in it, and thirty-five came up, and three or four of them never did get out of the crooks before they died; those three or four were included in the thirty-five that came up. My boy bought some of those same Ferguson seed at the same time I did, and he had about the same success with them that I did; he was making a crop with me. I commenced on the 10th of April planting with Rowden seed, and then stopped and planted some Lone Star, and then planted Rowden again. I never had any trouble getting a stand with the Rowden seed."

### H. T. Hall testified:

"Along about the latter part of 1918, or the first part of 1919, I bought some Lone Star cotton seed from Guy Davis at Dawson; I bought eight bushels, I think. I was to pay $2.50 a bushel for that seed; I haven't paid anything. I planted that cotton seed and after I planted it, it didn't come up and I had to plant it over; that's the kind of luck I had with it; very few of the seed came up. Right by the side of that Lone Star cotton seed, the same day I think, I planted some other cotton seed of a different brand and got a good stand. When I found I didn't get a good stand of the Lone Star cotton from those seed, I dug into the ground to ascertain the condition of the Lone Star seed and they were rotten, mighty near every one you could find. Some few of them wasn't rotten, but most of them were rotten, say nine out of ten."

### W. C. Murphy testified:

"The latter part of 1918 or the first part of 1919 I bought some Lone Star cotton seed from Guy Davis at Dawson; I believe it was eight bushels I bought. I believe I planted approximately 14 bushels with the eight bushels of seed. When I commenced planting those seed, I opened one of the sacks and planted them about like you would plant any other cotton seed, putting plenty, I thought—they were small seed—and the place I planted the first sack I got, I reckon, about three-quarters of a stand, and this sack gave out and I opened up another sack and planted right on, and from there on with the balance of the seed I didn't get anything at all. Out of the 14 acres that I planted with the Lone Star seed, I afterwards plowed up I suppose about ten or eleven acres. At the time I planted the Lone Star seed, I also planted other seed of a different variety or kind, and did not have any trouble with the other kind. I planted the other kind of seed along at the same time and under the same conditions, and didn't change my planter at all. I planted the Lone Star seed at the usual time for planting cotton seed. Off the ten or eleven acres that I plowed up that had been planted with Lone Star seed, I don't suppose there was a hundred stalks of cotton on it."

### Jim Lee testified:

"About the latter part of 1918 or the first of 1919, I bought some Lone Star cotton seed from the Ferguson Seed Farms for the purpose of using some to plant myself, and I let some of my neighbors have some; I bought somewhere around a hundred bushels, at the price of $2.50 a bushel, I believe. A few of the sacks that I kept were good, and came up all right, but some of them didn't come up at all; they were kind of mixed seed; some of them wasn't as pure seed as I expected; the general average and quality of those seed as to germinating was about fifty-fifty. I know about some of the results that some of the other parties had with the seed I let them have; I had a right smart kick about them."

Evidently the action of the court in instructing a verdict was not because he did not believe that the appellant's pleadings asserted a cause of action, for, in that event, he would have sustained appellee's general demurrer and dismissed the case, but if so, the court was in error. We think the petition and supplemental petition, which seems to have been treated as an amended petition, set up a cause of action.

[1] We take it, however, from the record, that the court, after hearing all the evidence, concluded that the matters complained of in appellant's original petition and supplemental petition, viewed in the light of the proof offered, failed to show any legal grounds for action, and hence directed the verdict. In determining the propriety of directing a verdict, the evidence must be considered most favorably to appellant, disregarding the conflicts and contradictions.

[2] He, having introduced evidence tending to support the allegations in his petition, was entitled to have the issue submitted to the jury, no matter how strong or how much in conflict the contradicting evidence may have been. Harpold v. Moss, 101 Tex. 542, 109 S. W. 928; Price v. Yellow Pine Paper Mill Co. (Tex. Civ. App.) 240 S. W. 594.

[3] If the petition stated a cause of action, for the court to take the case away from the jury, the evidence must be of such character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it. Choate v. Railway Co., 90 Tex. 88, 36 S. W. 247, 37 S. W. 319; Price v. Yellow Pine Paper Mill Co. (Tex. Civ. App.) 240 S. W. 594.

Appellant contends that the seed were sold upon an express warranty of their fitness for the purpose for which they were bought, planting purposes, and if not upon an express warranty, then upon an implied warranty. Appellee strenuously denies that they were sold upon any warranty, but insists that they were sold under the terms of its "Stringless Guarantee," which, under the facts, appellee claims entirely absolves it from any liability asserted by appellant.

[4] Whether there was a warranty, we think, must be determined from all the facts and circumstances in the case. The general rule is that when the purchaser discloses to the seller that the article is intended for a special use, and the seller sells it to the purchaser for that purpose and for a sound price, there is an implied warranty that the

article is suitable for the purpose for which it is sold, and free from hidden defects that would impair its use for such purpose, and especially is this true where the seller is the producer or manufacturer of the article sold.

[5] But appellee insists that there was no warranty, express or implied, for the reason that its "Stringless Guarantee," printed in its catalogues and upon the notice of shipment (termed "Acknowledgment of Order and Notice of Shipment," all one instrument, on a blank form containing invoice of sale), and upon the tags attached to the sacks in which the seed were shipped, expressly declared that no warranty, either express or implied, was given. Appellant contends that such was not the case, but that said "Stringless Guarantee" was in no wise any part of the contract, and that appellee's agent and salesman, Johnson, expressly warranted the soundness of the seed to him in their conversation preceding the giving of the order of October 29, 1918, which was, by agreement, later increased to a carload, and that appellee, in its letter to appellant of date November 18, 1918, expressly warranted the seed, using this language:

"All cotton seed which we sell are raised directly from the seeds which we have produced. They are grown under our supervision, ginned at our own gin, and we stand back of them in every particular."

It will be seen that the order of October 29, 1918, above set out, does not contain the "Stringless Guarantee" or any reference to same. Neither does the letter confirming said order, nor does the letter of confirmation, confirming the order increasing the amount of the original order to a carload, nor the acknowledgement of same, but the first time that same appears is on the notice of shipment (called "Acknowledgment of Order and Notice of Shipment" on blank form used by appellee containing invoice of sale) of date December 3, 1918, and upon the tags attached to the sacks in which the seed were shipped, which was after the order for the seed had been given by appellant and accepted by appellee. So, whether there was a warranty is a question of fact to be found by the jury from all the facts and circumstances in evidence. Coates v. Harvey (Super. Buff.) 2 N. Y. S. 5; Edgar v. Breck, 172 Mass. 581, 52 N. E. 1083; Godden Seed Co. v. Smith, 185 Ala. 296, 64 South. 100; Brooks v. McDonnell, 41 Wis. 139. But appellee says that the first order, that of October 29, 1918, was abandoned by appellant and a new order of date November 21, 1918, given, and that at that time appellant was familiar with appellee's catalogue, and the "Stringless Guarantee," and that said order was given and accepted under the terms and conditions of same. This appellant denies, and says at the time of giving the first order,

October 29, 1918, it was understood that it might be increased to a carload, and that appellee so understood and accepted said order, as shown by appellee's letter of date November 16, 1918, wherein appellee says:

"However, Mr. Davis, the intention is now that on or about December 1, to advance our wholesale price 10¢ per bushel, and we just merely want to remind you of it, so that if you are contemplating adding to your order, it will be well for you to do so before December 1."

[6] Appellant further insists that appellee's liability under the contract cannot be affected by the terms of the "Stringless Guarantee," as to whether there was a warranty, the same being presented and contended for after the giving and acceptance of the order for the seed, and not having been assented to by appellant. We will dispose of this contention of the parties by saying that if a warranty was actually made during the negotiations for the purchase of the seed, and not withdrawn or modified, it should be given effect, irrespective of the printed disclaimers. Moorhead v. Minneapolis Seed Co., 139 Minn. 11, 165 N. W. 484, L. R. A. 1918C, 391, Ann. Cas. 1918E, 481; Edgar v. Breck, 172 Mass. 581, 52 N. E. 1083; Landreth v. Wyckoff, 67 App. Div. 145, 73 N. Y. S. 388; Bell v. Mills, 78 App. Div. 42, 80 N. Y. S. 34; Smith v. Windsor (Tex. Civ. App.) 242 S. W. 350.

Appellant complains that upon the trial he offered to introduce the testimony of the parties who had bought the seed from him to prove that by reason of the failure of the seed to germinate the purchasers of said seed had suffered certain losses, for which he was liable, and which was by the court excluded. Appellant also complains that the court refused to permit him to prove, as a basis for his damages against appellee, that the purchasers of said seed from appellant had paid him for said seed at the rate of $2.60 per bushel for all the seed he had purchased from appellee (except about forty bushels), and sold to his said customers, and that appellant was liable to said purchasers of said seed from him for the return of the purchase-money price so received by appellant from them.

These propositions present the difficult question in the case. The record discloses that appellant purchased the seed for resale to his gin customers; that the purpose for which the seed were bought was made known to and fully understood by appellee at the time of the purchase; that appellant resold at cost practically all the seed to his said customers, farmers of his vicinity who patronized his gins; that about one-half of said customers paid appellant cash for their seed, and that he sold the others on credit, and that they had not paid him, saying that as the seed did not germinate they did not owe him anything, and that he had not paid back to any of the purchasers of said seed

the money they had paid to him nor had they sued him for same, nor does the record affirmatively show that they were claiming a refund, but appellant admitted his liability to them. When the evidence was offered and excluded by the court, the following took place:

"Mr. Mays: Your honor holds that even if Davis was liable to the purchasers of this seed for the profits they should have made upon the crops, that that would not be an element of damage that Davis could recover against the Ferguson Seed Farm?

"The Court: I don't think so.

"Mr. Mays: We except to the ruling of the court, and we would like to state that we could show, if permitted, that the profits per acre would have been $20.00.

"The Court: All right. Whenever you present any evidence showing that Mr. Davis has paid any customer anything for damages, I will permit that particular customer to testify on the very matter under discussion.

"Mr. Mays: The court is going to hold that before we can recover we will have to show we paid people to whom we sold the seed?

"The Court: Yes.

"Mr. Mays: Let me ask you this question: Suppose at this time we have not paid, and suppose later we were sued and held liable to the people with whom we dealt, could we go back and sue the Ferguson Seed Farms, notwithstanding the trial here? Wouldn't it be res adjudicata?

"The Court: It might be.

"Mr. Mays: We will not be able to prove that we have settled with any people to whom we sold these seed; however, I want to make the proof so as to preserve my bill. We except to the ruling of the court, and will state to your honor, without having to put the different witnesses on the stand.

"The Court: Let your bill recite as indicated this morning, that the profits would have been practically $20.00 an acre.

"Mr. Mays: And we can prove that by the testimony of this witness, and W. N. Matthews and ten other witnesses, the same facts.

"The Court: All right."

[7] So, it appears that the court instructed a verdict for appellee upon the theory that before appellant would be entitled to damages against appellee, he must show that he, appellant, had refunded to his customers the damage suffered by them. Opposed, to this holding of the court, appellant presents the proposition "That the test of the Ferguson Seed Farms' liability was whether plaintiff, Guy Davis, was liable to the purchasers of said seed for damages resulting to them from the failure of said seed to germinate, and that it was not necessary, as held by the trial court, that before liability of the Ferguson Seed Farms would arise, plaintiff, Guy Davis, must have adjusted his liability with those who bought seed from him by paying him therefor." We think the contention of appellant must be sustained. The rule seems to be well settled that when an article has been sold with a warranty, and the vendee resells the same with a like warranty, the first purchaser may recover for a breach of the warranty, although he has resold the goods and has not refunded any sum to his vendee, and no claim against him has been made. Randall v. Raper (Eng. 1858) El., Bl. & El. 84, 96 Com. L. 82; Denton v. Gill & Fisher, 102 Md. 386, 62 Atl. 627, 3 L. R. A. (N. S.) 465; Buckbee v. Hohenadel, 224 Fed. 14, 139 C. C. A. 478, L. R. A. 1916C, 1001, Ann. Cas. 1918B, 88; Muller v. Eno, 14 N. Y. 597, 601-605-609; Western Twine Co. v. Wright, 11 S. D. 521, 78 N. W. 942, 44 L. R. A. 438; Smith v. McNair, 19 Kan. 330, 27 Am. Rep. 117; McClatchey v. Anderson, 84 Neb. 783, 122 N. W. 67.

In Randall v. Raper, supra, the defendant sold thirty quarters of seed barley to plaintiff, warranting same to be Chevalier seed barley, for a stipulated price, which plaintiffs paid him.

"Plaintiffs were corn factors and purchased the seed barley for the purpose of reselling it in the way of their trade. The seed barley delivered was not Chevalier seed barley. Without any knowledge of the breach of warranty, and believing the seed to be Chevalier seed barley, the plaintiffs sold to several subvendees the same seed barley delivered to them by the defendant, and sold it under a like warranty given by the defendant to the plaintiffs. The subvendees sowed the seed, and the seed not being Chevalier seed barley, as it had been warranted to be, produced inferior crops, whereby the subvendees were damnified and injured. The plaintiffs then became liable to compensate and make good to the subvendees, respectively, the damages by them so sustained and incurred. The plaintiffs, the original vendees, thereupon sued the vendor to recover the amount for which they were liable, but had not yet paid to the subvendees."

Upon final hearing before the Court of Queen's Bench, Lord Campbell, Chief Justice, after remarking that, "If the plaintiffs had paid the subvendees the amount of damages claimed by them, there would have been no doubt as to the right of plaintiffs to recover from the defendant the sums thus paid to the subvendees," observed:

"But then it is contended, secondly, that, even if the damages could be recovered in the event of actual payment, they cannot be recovered upon a mere liability. I think we cannot lay down a rule that the mere liability cannot be the foundation of damages; if it can, the amount may be estimated by a jury. The demand is made, and is a just one; and though it is not yet satisfied, yet the jury may find to what extent the plaintiffs are damnified by their having become liable to it."

And Judge Erle said:

"But then it is said that here the plaintiffs have made no actual payment, so that if they recovered such damages in this action, they might put them into their own pockets with-

out paying their subvendees. But I think that the true rule is that a liability to loss is sufficient to give the party liable a title to recover."

And Judge Crompton observed:

"Taking the narrowest rule as to the probable and necessary consequences of a breach of contract, these damages fall within it. It is said, however, that the plaintiffs have here only incurred a liability, and have made no payment. But I entirely deny that payment is necessary to entitle a party to recover. Liability alone is sufficient."

Denton v. Gill & Fisher, supra, was a case in which Denton Bros. sued their vendors for a deficiency in quantity of grain resold by Denton Bros. The original vendors resisted the suit on the ground that Denton Bros. had not paid back to their vendees the amount for which they, Denton Bros., were liable to their said vendees on the resale. In passing upon this question, the court said:

"Compressed into the narrowest compass the situation presented is this: Denton Bros. purchased from Gill & Fisher 3,000 quarters of corn, and sold the same corn to Bowring & Archibald; Bowring & Archibald through C. T. Bowring & Co. sold the same corn to Montgomery, Jones & Co. The last-named purchasers paid C. T. Bowring & Co. in full. It is alleged that there was a material shortage in the weight when the corn was delivered. Montgomery, Jones & Co. were refunded the amount of that shortage by C. T. Bowring & Co.; C. T. Bowring & Co. were refunded the same amount by Bowring & Archibald and the latter have made a demand on Denton Bros. to refund the same amount. Denton Bros. have not paid back that amount but have sued Gill & Fisher, their vendors, to recover the sum which they, Denton Bros., are liable to pay on account of the same shortage to their vendee. The question on these facts is can Denton Bros. maintain this suit until they actually pay back to their vendee the amount claimed by the latter from Denton Bros. on account of that shortage? This question is the one raised by the demurrer to the fourth count of the narr. and by the fourth instruction granted at the instance of the appellees and the second rejected prayer of the appellants. We will dispose of that question before stating or considering the other or remaining inquiry.

"If Denton Bros. had not resold the grain to Bowring & Archibald and if, after they had paid Gill & Fisher the agreed price for the entire 3,000 quarters of corn purchased from the latter, it had been discovered that the vendors had, in fact, failed to deliver over 200,000 pounds of the corn sold and paid for, it could not be questioned that Denton Bros. would have a sustainable cause of action against Gill & Fisher for a breach of the latter's contract. How can the resale of the corn by Denton Bros. extinguish Gill & Fisher's obligation to comply with their contract, or exonerate them from the consequences of a breach which occasions a failure of consideration? The right of the vendee to recover from the vendor for a failure of consideration is founded on the simple fact that the former has not received from the latter what the vendor sold and agreed to deliver and what the vendee paid for and contracted to get. The breach consists in the failure of the vendor to live up to his contract and no subsequent sale of the grain by the vendee can obliterate or condone that breach. If a sale of the same commodity by the vendee to a subvendee extinguishes the responsibility of the vendor to make good a shortage to his vendee, then a payment to the subvendee by his vendor of the damages caused by the shortage, would revive the first vendor's responsibility to his vendee; and thus the obligation of the first vendor to make good a deficiency to his vendee would depend, not upon his own breach of the contract of sale, but upon a collateral and independent transaction between the vendee and a third party who is a total stranger to the original contract of sale.

"The adjudged cases do not support that view. Allusion will now be made to some of them."

The court then cites and discusses a number of authorities, and concludes:

"We hold, then, for the reasons and upon the authorities already alluded to that Denton Bros., the legal plaintiffs, were entitled to recover from Gill & Fisher the amount for which they, Denton Bros., were liable to the subvendee, notwithstanding the fact that Denton Bros. had not paid over the sum for which they were so liable to the subvendees."

Buckbee v. Hohenadel, supra, was a suit growing out of the sale of cucumber seed. The court, after reviewing Randall v. Raper and many other decisions, said:

"We are of opinion, therefore, that the foregoing considerations authorized the rule of damages adopted herein, unless the above stated facts, that the plaintiffs had neither paid nor adjusted the damages suffered by the grower of the crops, bar recovery of indemnity on their behalf of the alleged liability incurred through the sale to the grower; and the question of the right to recover thereupon, beyond the above mentioned $300 item of damages which was paid, remains for determination. That such recovery is authorized without prepayment of the plaintiff's liability to the subvendee is expressly decided (as above shown) in Randall v. Raper, supra, but the contentions of error in like ruling herein are in substance: (a) That it is unsupported by any other authority; and (b) that its doctrine is unreasonable and open to serious abuse. We believe neither of these propositions is tenable."

In Muller v. Eno, supra, the jury were instructed that the defendants were not entitled to any allowance on that part of the goods which they had sold as sound, unless they proved that "reclamations" had been made upon them by the purchasers. The court, in passing upon this question, after discussing the question and citing authorities, said:

"In accordance with the doctrine here laid down the rule of compensation is now well set-

tled, and this compensation, it should be added, is due immediately. I mean it is due immediately where the warranty relates to the soundness or quality of the article sold. The promise is not one of indemnity against loss on a resale of the thing warranted by the purchaser. The promise is broken as soon as made, although the defect may not then be known, and its effect is to subject the vendor at once to a legal liability to make good in money the difference between the article as sound and its actual value. This liability stands upon the same footing as any other pecuniary obligation or debt, and I do not see how, upon principle, it is impaired in the manner supposed by the price or circumstances attending a sale by the vendee to another person. It may be that the vendee with warranty will profit by the rule in a case where the purchaser from him can not or does not claim redress, but it does not follow that the rule is unjust to the vendor. He is required simply to make good his own contract, and I do not see how he can discharge that obligation by inquiring into relations between other parties. * * * We have seen that by the terms and effect of the contract, compensation is due immediately, according to the measure which the law has fixed, and I believe there is no principle or authority for saying that the vendor may repel the obligation by showing that his vendee has received an indemnity in his dealing with other persons."

[8] If the subpurchasers of the seed had sued appellant, there can be no question but that he would have had the right to plead over against appellee on its warranty, and if the warranty of the seed by appellee to appellant was established, together with the nonfitness of the seed for the purpose for which they had been sold, then to have had judgment over against appellee for such sum as was rendered against him. Then, when the legal liability against appellant for the breach of the warranty from him to his vendees came into existence, why should not he, because of such liability, be permitted, without first having discharged his liability to his vendees, to recover from appellee, the party whose wrong caused the loss, and thus be afforded the means to enable him, without loss to himself, to return the money voluntarily to his vendees, if in good conscience he felt that he should do so. We can perceive of no good reason why he should not. Furthermore, the authorities are unanimous in declaring that the amount received upon resale has no bearing, either on the right of the vendee to recover, or the amount of damages recoverable for breach of warranty, except as it may be evidence of the actual value of property furnished. Ellison v. Johnson, 5 L. R. A. (N. S.) 1151, note; Union Selling Co. v. Jones, 128 Fed. 678, 63 C. C. A. 224; Western Twine Co. v. Wright, 11 S. D. 521, 78 N. W. 942, 44 L. R. A. 438; McClatchey v. Anderson, 84 Neb. 783, 122 N. W. 67; Williston on Contracts, vol. 3, § 1391; Sutherland on Damages, vol. 3, §§ 670–675; Mechem on Sales, vol. 2, § 1837.

[9] Appellant complains that the court erred in permitting appellee to introduce in evidence portions of its catalogue, the invoice, and shipping tags, in and upon which were printed stipulations ("Stringless Guarantee") limiting appellee's liability for damages in the event the seed failed to germinate, contending (1) that same were not embraced in the contract, but were conditions and limitations sought to be ingrafted into the contract after the contract for the purchase of the seed was made; (2) that the mailing to customers of catalogues containing said "Stringless Guarantee" and the printing of same upon invoices of seed sold and upon the shipping tags attached to sacks containing same, could not have the effect of embracing said stipulations in a contract already made, and that had been made without their inclusion.

We think the proposition as to the admissibility of said evidence should be overruled. The evidence was admissible upon the question of what was the contract, and whether the seed were sold with a warranty. Moorhead v. Minneapolis Seed Co., 139 Minn. 11, 165 N. W. 484, L. R. A. 1918C, 393, Ann. Cas. 1918E, 481; Godden Seed Co. v. Smith, 185 Ala. 296, 64 South. 100.

[10] Of course, if the seed were sold with a warranty, the printing on the invoice and the shipping tags of the disclaimers ("Stringless Guarantee") would have no effect upon the warranty. Moorhead v. Minneapolis Seed Co., 139 Minn. 11, 165 N. W. 484, L. R. A. 1918C, 393, Ann. Cas. 1918E, 481; Landreth v. Wyckoff, 67 App. Div. 145, 73 N. Y. Supp. 388; Edgar v. Breck, 172 Mass. 581, 52 N. E. 1083.

For the errors indicated, the judgment is reversed and the cause remanded.

Reversed and remanded.